CITY of FAYETTEVILLE, Arkansas  v.
WASHINGTON COUNTY, ARKANSAS;  Lee Ann Kizzar,
Assessor;  Fayetteville School District;  Fayetteville Public Library;
Police Pension & Relief Fund Board of Trustees;  Firemen's Pension
& Relief Fund Board of Trustees;  and Richard Weiss, in His Official
Capacity as Director, Arkansas Department of Finance
and Administration

06-602                                                     255 S.W.3d 844

Supreme Court of Arkansas
Opinion delivered April 26, 2007

*Kit Williams*, Fayetteville City Attorney, for appellant.

*Rudy Moore, Jr.*, for appellee Fayetteville School District.

*William E. Keadle, Jessica C. McGhee*, and *Ronna L. Abshure*, Revenue Legal Counsel, for appellee Richard Weiss.

*Bassett Law Firm, LLP*, by: *Vincent O. Chadick*, for appellee Fayetteville Public Library.

*Quattlebaum, Grooms, Tull & Burrow, PLLC*, by: *Jeb H. Joyce* and *Timothy W. Grooms*, for amicus curiae Arkansas Municipal League.

ROBERT L. BROWN, Justice. The City of Fayetteville ("City") appeals from an order of the circuit court in which the court concluded that the rates and property values certified by the Washington County Assessor for purposes of tax-increment financing were correct. Because of its conclusion, the court denied the City's request for a mandatory injunction against Washington County for the redistribution of the tax-increment revenues. On appeal, the City raises four points: (1) the circuit court erred in holding that the Assessor was correct in allocating a larger millage rate to the Fayetteville School District ("School District") than was passed by the voters; (2) the circuit court erred in not holding that Amendment 78 modified Amendment 74 so that the uniform rate of 25 mills could be applied against the increment value and used to pay the bond indebtedness incurred by the redevelopment project; (3) the circuit court erred in not ruling that the Arkansas Community Redevelopment Financing Act ("Redevelopment Act") provides for the inclusion of the uniform rate of 25 mills in Amendment 74 to finance redevelopment projects; (4) the circuit court properly held that the mills passed for the Fayetteville Public Library, the Police Pension Fund, and the Firefighters Pension Fund should be included in the total ad valorem rate and applicable ad valorem rate, as defined by the Redevelopment Act, to pay the indebtedness of the redevelopment project.

The City's fourth issue is the same issue raised by the Library and Pension Funds in their cross-appeal. However, the Pension Funds failed to pursue their appeal after their notice of cross-appeal was filed. They filed no brief in this court in support

of their cross-appeal; nor did they make an oral argument to this court. We hold that the Pension Funds abandoned their cross-appeal.

On November 5, 1996, the Arkansas voters adopted Amendment 74 to the Arkansas Constitution, which authorized a uniform rate of 25 mills for each school district as the ad valorem property tax rate "to be used solely for maintenance and operation of the schools."[1]

On September 19, 2000, the Fayetteville School District voters approved a levy of 44 mills for the school tax.[2] The 44 mills included 19.3 mills "for general maintenance and operation" and 1.0 mill "for current expenditures/dedicated maintenance and operation expenditures dedicated for the purposes of purchasing school buses, furniture and equipment, purchasing computer software, and renovating and repairing existing facilities." A total of 23.7 mills was designated "for debt service as a continuing levy pledged for the retirement of existing bonded indebtedness."

On November 7, 2000, the people of Arkansas adopted Amendment 78 to the Arkansas Constitution, which went into effect on January 1, 2001, and authorized the General Assembly to establish a procedure for tax increment financing ("TIF") for redevelopment districts. This type of financing provides that the funds derived from a certified millage rate levied against any increase in property values in the redevelopment district after the establishment of the district may be used to pay the bond debt incurred by that district.

On March 29, 2001, the General Assembly passed Act 1197 of 2001, which is the Redevelopment Act to implement Amendment 78, and subsequently amended it by Act 2231 of 2005. *See* Ark. Code Ann. §§ 14-168-301 to 14-168-322 (Supp. 2005). On November 21, 2002, this court handed down its decision in *Lake View School District No. 25 v. Huckabee*, 351 Ark. 31, 91 S.W.3d 472 (2002). In that opinion, we held that Amendment 74 clearly stated that every school district was responsible for assessing a uniform rate of 25 mills solely for the maintenance and operation of its

---

[1] Amendment 74 amended Article 14, § 3 of the Arkansas Constitution, and was incorporated therein. For ease of reference in this opinion, we will refer to Amendment 74 rather than Article 14, § 3.

[2] The court assumes that the election was held the same day as the date on the election ballot. The election ballot is part of the record in this case.

schools. *See id.* We also held that Amendment 74 did not contemplate that a millage adopted by the school district for an entirely different purpose like debt service might be credited against the 25 mills owed under Amendment 74. *See id.*[3]

Various actions were then taken by the City and Washington County to implement a redevelopment district under the Redevelopment Act:

- On August 17, 2004, the Fayetteville City Council passed Ordinance No. 4608, which formed and named the Highway 71 East Square Redevelopment District Number 1 of Fayetteville ("the Highway 71 Redevelopment District") and authorized the preparation of a project plan.

- On December 7, 2004, the Fayetteville City Council passed Ordinance No. 4646, which adopted the project plan for the Highway 71 Redevelopment District, found that the project plan was economically feasible, and authorized the issuance of tax increment financing bonds to fund the improvements outlined in the present plan.

- On December 13, 2004, the Washington County Quorum Court approved Ordinance No. 2004-68, which levied the county, municipal, and school district taxes for the year 2004.

- On December 28, 2004, the Fayetteville City Council passed Ordinance No. 4662, which repealed Ordinance No. 4608 (for possible technical notification problems) and formed and named the Highway 71 Redevelopment Project. The Fayetteville City Council also passed Ordinance No. 4663, which repealed Ordinance No. 4646 (for minor technical notification problems) and adopted the Project Plan for the Highway 71 Redevelopment Project.

- On January 25, 2005, the Fayetteville City Council adopted Ordinance No. 4673, which modified the borders of the Highway 71 Redevelopment District.

---

[3] At the January 26, 2006 bench trial in this case, Lisa Morstadt, the School District's Chief Financial Officer, testified that in 2003, following this court's *Lake View* decision, the School District was forced to change its method of calculating the debt service millage in order to comply with this court's opinion regarding the uniform rate of 25 mills under Amendment 74. Ms. Morstadt explained that this change required a vote of the citizens of the School District and it also "required the District to refinance some of its debt so that it would be reflected in the bond documents."

- On January 29, 2005, the Washington County Assessor, Lee Ann Kizzar, issued her assessor's certificate as required by Arkansas Code Annotated § 14-168-306(b)(5) (Supp. 2003), for the approval of the Highway 71 Redevelopment District. In her certificate, Assessor Kizzar, in order to comply with the Redevelopment Act, included the total ad valorem rate (26.86), the debt service ad valorem rate (23.7), and the applicable ad valorem rate (3.16).

- On March 15, 2005, the Fayetteville City Council passed Ordinance No. 4683, which amended the Project Plan for the Highway 71 Redevelopment District and found that the plan was economically feasible. On that day, the Fayetteville City Council also passed Ordinance No. 4684 to issue bonds in the amount of $3,725,000 to finance the Highway 71 Redevelopment Project.

On May 16, 2005, the City filed an amended complaint for declaratory judgment and mandatory injunction against the separate defendants/appellees. In its declaratory-judgment claim, the City asserted that the ad valorem rates certified by Assessor Kizzar were incorrect. According to the City, the total ad valorem rate under the Redevelopment Act should have included the entire amount levied by Washington County on behalf of the School District on September 19, 2000, as well as the uniform rate of 25 mills required under Amendment 74. The City prayed that the circuit court declare what were, in fact, the correct legal and constitutional amounts for the total ad valorem rate and the debt service ad valorem rate under the Redevelopment Act. The City further prayed for a mandatory injunction against Washington County, directing the county to distribute the Redevelopment District's tax-increment funds according to the court's declaratory judgment order and not to distribute any of the contested tax-increment funds until the court had determined, through its declaratory judgment, the legal and constitutional division of the collected millages.

The City and the Arkansas Department of Finance and Administration subsequently filed cross motions for summary judgment. A bench trial was held by the circuit court, and on February 24, 2006, the circuit court issued an order where it concluded that the rates and values determined by Assessor Kizzar were correct. As a result, the court denied the City's request for an injunction against Washington County concerning any distribution of the disputed funds.

In the letter opinion that was incorporated into the order, the court made three specific findings. First, the court concluded that the uniform rate of 25 mills authorized by Amendment 74 for maintenance and operation of the public schools could not be used to fund TIF districts under Amendment 78. The circuit court's rationale was that the 25 mills was not a "local general property tax," but rather a tax passed by all the voters of this state. The court also ruled that although the General Assembly amended the Redevelopment Act in 2005 to include "the State" in the definition of a taxing unit for purposes of the total ad valorem rate, it was not the law in effect on January 29, 2005, which was the date that Assessor Kizzar issued her certification.

Next, the circuit court ruled that Assessor Kizzar was correct to include the 1 mill for the Library and .8 mill for the Pension Funds in her calculation of the total ad valorem rate under the Redevelopment Act. The court reasoned that the City was a local taxing unit under Amendment 78 and was entitled to use the 1.8 mills from the Library and Pension Funds to back the redevelopment district bonds.

The circuit court determined, as a third finding, that Assessor Kizzar was correct in her certification that the debt service ad valorem rate was 23.7 mills. According to the court, this was because the 23.7 mills were dedicated for debt service in the school tax passed by the voters of the School District on September 19, 2000, which was before January 1, 2001, the effective date of Amendment 78. The court noted that Amendment 78 made it clear that all ad valorem taxes for debt service approved by voters in a taxing unit before the effective date of the amendment should be excluded. The circuit court went on to conclude that the meaning of Amendment 78 was plain and clear that the 23.7 mills for debt service was the correct number to be excluded from the total ad valorem rate in determining the applicable ad valorem rate under the Redevelopment Act. The circuit court, accordingly, held that Assessor Kizzar properly certified the applicable ad valorem rate for the 2004 tax year to be 3.16 mills, which was the difference between the total ad valorem rate of 26.86 mills minus the debt service ad valorem rate adopted on September 19, 2000, of 23.7 mills.

## I. Declaratory-Judgment Relief

Before addressing the City's first point, we consider the question of whether declaratory-judgment relief is proper in this

case. According to the City, it is proper because the subject matter of this case is justiciable, in part because financing for TIF districts is a matter of significant public interest, which affects not only the City's project but multiple proposed redevelopment districts across the state. At issue is the disputed allocation of millions of dollars of TIF funds and what funds can be used to back bonds sold to implement the redevelopment project. At issue also is the potential for an illegal-exaction suit and resulting attorney fees if taxes levied for one purpose were unconstitutionally diverted for a different purpose by a different governmental entity in violation of Article 16, § 11 of the Arkansas Constitution.

Specifically, the City contends that Amendment 78 repeals Amendment 74 in part. Notwithstanding the fact that the bonds have been approved and sold for the redevelopment district using an applicable ad valorem rate of 3.16 mills, the City wants the applicable ad valorem rate to include the disputed 4.5 mills discussed below and the uniform rate of 25 mills dedicated to school maintenance and operation under Amendment 74, in order to pay off the bonds more quickly. By Quorum Court Ordinance No. 2004-68 passed in 2004, the debt service millage for the schools was changed by the Quorum Court to reflect 19.2 mills, which is the millage rate the City maintains is correct.[4]

Hence, the issues that persist are, first, whether the applicable ad valorem rate of 3.16 mills is correct for purposes of the preexisting bond indebtedness authorized by City Ordinance No. 4683 on March 15, 2005, or whether the applicable ad valorem rate should include 4.5 mills for purposes of those bonds. The second issue that persists is whether Amendment 74's 25 mills should also be included in the applicable ad valorem rate for purposes of paying off these bonds.

The City asked for declaratory relief in this case. The statute pertaining to declaratory judgments reads:

> Any person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other

---

[4] Ordinance No. 2004-68 filed on December 13, 2004, puts the total School District millage at 44.2 mills as opposed to the 44 mills shown in the ballot dated September 19, 2000. According to testimony by Lisa Morstadt, Chief Financial Officer for the School District, the voters of the School District voted to raise the millage from 44 to 44.2 mills after the 2000 election.

legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

Ark. Code Ann. § 16-111-104 (Repl. 2006).

This court has said the following with regard to declaratory judgments:

[D]eclaratory relief will lie where (1) there is a justiciable controversy; (2) it exists between parties with adverse interests; (3) those seeking relief have a legal interest in the controversy; and (4) the issues involved are ripe for decision. We have further stated: The courts do not construe acts similar to said Act 274 [of 1953, known as the Declaratory Judgment Act,] to require actual litigation as a prerequisite to asking for a declaratory judgment, but they do state, as a general rule, that litigation must be pending or threatened.

*Jegley v. Picado*, 349 Ark. 600, 613, 80 S.W.3d 332, 337 (2002) (internal citations and quotations omitted).

■ The appellees do not contest that this is an appropriate matter for declaratory judgment. We agree with the City. Surely these questions that directly affect an existing bond issue present a justiciable issue for the circuit court and this court to decide. We hold that the City is correct and that the four criteria set out in *Jegley* are met. Accordingly, we agree that an action for declaratory judgment lies.

## II. Millage for Debt Service

For its first point on appeal, the City contends that the circuit court erred in holding that the Washington County Assessor was correct to allocate more mills to the School District for purposes of the TIF formula than were passed by the voters. The City claims that Assessor Kizzar's calculations for the certification made on January 29, 2005, included 4.5 mills more in school taxes than the voters of the school district had approved on September 19, 2000.

The City explains that the assignment of 23.7 mills for school debt service would mean that 48.7 mills (23.7 mills for debt service plus the uniform rate of 25 mills) would be directed to the

School District rather than the 44 mills approved by the voters for school taxes prior to January 1, 2001, or the 44.2 mills approved by the voters at the subsequent election. The result, according to the City, is an illegal exaction due to diversion of 4.5 mills to the schools without voter approval. The City adds that the Assessor's certification for debt service is unconstitutional despite the Assessor's good faith reliance on the voters' approval of 23.7 mills for debt service on September 19, 2000, and the definition of the debt service ad valorem rate found in Arkansas Code Annotated § 14-168-301(5) (Supp. 2003), which points to the debt service in effect as of January 1, 2001. The City explains, in addition, that 44 mills less 23.7 mills leaves only 20.3 mills for maintenance and operation and not the constitutionally mandated uniform rate of 25 mills. Because of this, the City concludes that the assignment of 23.7 mills for debt service was unconstitutionally high by 4.5 mills.

The School District's retort is that Amendment 78 specifically excludes from funds available to the TIF district any ad valorem taxes for debt service approved by the voters prior to the effective date of Amendment 78. That effective date was January 1, 2001. The School District also argues that the original Redevelopment Act (Act 1197 of 2001) specifically referred to the debt service rate as of January 1, 2001. *See* Ark. Code Ann. § 14-168-303(5) (2001). The School District emphasizes that the debt service rate passed by the voters prior to January 1, 2001, was 23.7 mills.

Our analysis begins with the certification by Assessor Lee Ann Kizzar. She certified that the total millage for all county, city, and public school property taxes included in Quorum Court Ordinance 2004-68 for 2004 was 26.86 mills. She further certified the debt service ad valorem rate for the public schools as of January 1, 2001, was 23.7 mills. That rate is defined by the Redevelopment Act as "that portion of the total ad valorem rate that has been, at January 1, 2001, pledged to the payment of debt service on bonds issued by any taxing unit in which all or any part of the redevelopment district is located[.]" Ark. Code Ann. § 14-168-301(5) (Supp. 2003).[5] Assessor Kizzar testified at the bench trial that she looked to the September 19, 2000 "School Tax" ballot, which stated that 23.7 mills would be used for debt service for the school

---

[5] The 2005 amendment to § 14-168-301(5) removed the January 1, 2001 date, effective April 13, 2005:

district, to reach the conclusion that the debt service ad valorem rate as of January 1, 2001, was 23.7 mills.

There is one insurmountable problem with simply affirming the assignment of 23.7 mills as the debt service ad valorem rate. It is obvious from the ballot that the 23.7 mills assigned to debt service on the September 19, 2000 ballot actually included a portion of the 25 mills that was to be set aside for general maintenance and operation of the schools under Amendment 74. In fact, the September 19, 2000 ballot said that only 19.3 mills, and not the uniform rate of 25 mills under Amendment 74, would be used for school maintenance and operation. Because the total millage passed by the voters for schools on September 19, 2000, was 44 mills, the assignment of 23.7 mills for debt service violated Amendment 74's mandate that 25 mills be used *solely* for general maintenance and operation of the schools. *See Lake View, supra.* The reason is simple: 23.7 mills plus 25 mills exceeds the voters' approval of 44 mills. In fact, as previously noted, following this court's decision in *Lake View*, the School District was forced to refinance part of its debt in 2003 to comply with this court's *Lake View* ruling and Amendment 74 for purposes of its bond issue. In short, the assignment of 23.7 mills for debt service of the 44 mills passed in the September 2000 election by voters in the Fayetteville School District was unconstitutional in light of Amendment 74 and *Lake View*. Thus, the use of 23.7 mills as the figure for debt service in the TIF formula cannot stand.

The result of this problem is that the 23.7 mills dedicated to debt service in Assessor Kizzar's certification includes 4.5 mills beyond the 44.2 mills the voters approved for public-school taxes at the time of the Assessor's certification.[6] Using the Assessor's certification of 23.7 mills for debt service in the January 29, 2005 certification would mean that an additional 4.5 mills would be

---

(5)(6) "Debt service ad valorem rate" means that portion of the total ad valorem rate that has been, at January 1, 2001, as of the effective date of the creation of the redevelopment district, is pledged to the payment of debt service on bonds issued by any taxing unit in which all or any part of the redevelopment district is located[.]"

Ark. Code Ann. § 14-168-301(6) (Supp. 2005) (strikethroughs and underlines added).

[6] Ordinance No. 2004-68 shows the total School District millage to be 44.2 rather than the 44 mills shown on the September 19, 2000 ballot.

directed to the School District.[7] Clearly, that would violate the Arkansas Constitution and the jurisprudence of this court. *See* Ark. Const. art. 16, § 11; *Maas v. City of Mountain Home*, 338 Ark. 202, 992 S.W.2d 105 (1999).

While we recognize that Amendment 78 refers to an exclusion of taxes for debt service as of January 1, 2001, that presupposes that the debt service tax is constitutional. Here, it is clear that the 23.7 debt service tax is unconstitutional and invalid. We hold, accordingly, that the debt service rate for purposes of the Assessor's certification on January 29, 2005, must be limited to 19.2 mills, and we modify the Assessor's certification to refer to the correct millage rate of 19.2 mills.

### III. Repeal of Amendment 74 by Amendment 78

For its next point, the City claims that Amendment 78 did not repeal the uniform rate of 25 mills to be used for maintenance and operation of the schools *in toto* as provided under Amendment 74 but only worked "a slight modification" of it. The City contends that under Amendment 78, any revenues generated by applying the 25-mill uniform rate against the increment value of the property in the redevelopment district should be used to pay the bond debt of the district.

In making its argument, the City relies on the following language in Amendment 78: "any increase in the assessed value of property in the area obtaining after the effective date of the ordinance approving the redevelopment plan for the district shall be used to pay any indebtedness incurred for the redevelopment project . . . ." Ark. Const. amend. 78 § 1(d). The City adds that Amendment 78 contains a general repealer clause that any provision of the Arkansas Constitution in conflict with this section is repealed. *See* Ark. Const. amend. 78 § 1(f).

The City adds three more arguments. It emphasizes that Amendment 78 includes an express exclusion for debt service millage but that it does not expressly exclude the 25 mills set out in Amendment 74. Secondly, the City claims that in order to accom-

---

[7] According to Assessor Kizzar's testimony, 4.5 mills over the 19.2 would be allocated to the School District. She explained that her understanding was that the taxes for the increment amount in increased property value would be distributed differently from the taxes on the base value of the property.

plish Amendment 78's and the Redevelopment Act's goal of financing redevelopment projects, it is essential to use the 25 mills for project financing as this millage would almost always be the lionshare of the millage available for the financing. The City also urges that statutory changes to the Redevelopment Act made by the General Assembly in 2003 and in 2005 expressly show that the General Assembly intended to include Amendment 74's 25 mills for project financing, when proposing Amendment 78 to the voters of this state as an initiated act. It urges, as a final point, that Act 2231 of 2005, which changed the definition of total ad valorem rate by adding "State" in an attempt to remove any ambiguity that the 25 mills were available for redevelopment financing, should be considered in determining the original intent of the General Assembly in submitting Amendment 78 to a vote of the people.

This court has been absolutely clear about our role in interpreting the Arkansas Constitution: "The people of the State, in the rightful exercise of their sovereign powers, ordained and established the constitution; and the only duty devolved upon this court is to expound and interpret it." *Lake View*, 351 Ark. at 54, 91 S.W.3d at 484 (quoting *State v. Floyd*, 9 Ark. 302, 315 (1849)). We have specifically defined the standards we use when interpreting the Arkansas Constitution to be as follows:

> When interpreting the constitution on appeal, our task is to read the laws as they are written, and interpret them in accordance with established principles of constitutional construction. It is this court's responsibility to decide what a constitutional provision means, and we will review a lower court's construction *de novo*. We are not bound by the decision of the trial court; however, in the absence of a showing that the trial court erred in its interpretation of the law, that interpretation will be accepted as correct on appeal. Language of a constitutional provision that is plain and unambiguous must be given its obvious and common meaning. Neither rules of construction nor rules of interpretation may be used to defeat the clear and certain meaning of a constitutional provision.

*Smith v. Sidney Moncrief Pontiac, Buick, GMC Co.*, 353 Ark. 701, 720, 120 S.W.3d 525, 537 (2003) (internal citations omitted).

Amendment 74 specifically provides: "In order to provide quality education, it is the goal of this state to provide a fair system for the distribution of funds." Ark. Const. art. 14, § 3(a). It further

provides: "There is established a uniform rate of ad valorem property tax of twenty-five (25) mills to be levied on the assessed value of all taxable real, personal, and utility property in the state to be used *solely* for maintenance and operation of the schools." Ark. Const. art. 14, § 3(b) (emphasis added).

Amendment 78 was enacted for an entirely different purpose, which is to resuscitate and revive blighted communities within cities or counties by means of redevelopment projects. Amendment 78 reads in pertinent part:

> (d) The General Assembly may provide that the ad valorem taxes levied by any taxing unit, in which is located all or part of an area included in a redevelopment district, may be divided so that all or part of the ad valorem taxes levied against any increase in the assessed value of property in the area obtaining after the effective date of the ordinance approving the redevelopment plan for the district shall be used to pay any indebtedness incurred for the redevelopment project; provided, however, there shall be excluded from the division all ad valorem taxes for debt service approved by voters in a taxing unit prior to the effective date of this amendment.

Ark. Const. amend. 78, § 1(d). The Amendment also says that "[a]ny provision of the Constitution of the State of Arkansas in conflict with this section is repealed insofar as it is in conflict with this amendment." Ark. Const. amend. 78, § 1(f).

We turn then to the plain language of the two constitutional amendments. It is clear that Amendment 74 specifically mandates that a uniform rate of 25 mills be collected in each school district for funding education and that the tax levied be used "*solely* for maintenance and operation of the schools." Ark. Const. art. 14, § 3 (emphasis added). Amendment 78, on the other hand, provides that once a redevelopment district is formed by a city or county, "[t]he General Assembly *may* provide" for a tax to be levied to fund the redevelopment project. Ark. Const. amend. 78 § 1(d) (emphasis added). The language used in Amendment 78 is permissive and authorizes the General Assembly to provide for the funding of a redevelopment project by means of a formula, which includes the various taxes levied by local taxing units.

The critical stumbling block we see with the City's interpretation of Amendment 78 is that the voters of this state were never put on notice that Amendment 78 would effectively undo Amendment 74 by funding redevelopment projects with a portion

of the uniform rate of 25 mills that had previously been designated *solely* for the maintenance and operation of the public schools. In *City of Hot Springs v. Creviston*, 288 Ark. 286, 713 S.W.2d 230 (1986), this court held that if the authors of a constitutional amendment had meant for it to repeal a particular section of a constitutional article, they would have said so. We said:

> If the authors of Amendment 62 meant to repeal Section 1 of Article 16, they should and would have said so. In no other way could the voters have been put on notice that by adopting Amendment 62 they were destroying a safeguard that had existed for more than a century.

*See City of Hot Springs*, 288 Ark. at 293, 705 S.W.2d at 231.

Similarly, in this case, if the authors of Amendment 78 had meant for that Amendment to repeal Amendment 74 in any form or fashion, they would have said so explicitly. Otherwise, the voters, who had just four years previously passed Amendment 74 to set a uniform rate for the funding of public schools in hopes of achieving adequacy and substantial equality in public education, could not have been put on notice that by adopting Amendment 78, they were removing a portion of the money used for that very purpose. Amendment 78 does not do that, and we hold that it does not amend Amendment 74 in any respect.

We specifically note on this point that Amendment 78 expressly excepts Article XVI, § 14 (formerly Amendment 59) from any impact caused by an increase in property values within the Redevelopment District. Ark. Const. amend. 78, § 1(e). It would have been an easy matter for the drafters of the amendment to have also stated that the 25 mills would be part of the TIF formula, if that was their intent, but they did not do this.

Nor do we believe that the general repealer clause included in Amendment 78 creates a conflict with Amendment 74. When this court analyzes an espoused repeal by a general repealer clause, we do so in accordance with our statutory construction rules regarding repeal by implication:

> A statute of a general nature does not repeal a more specific statute unless there is a plain, irreconcilable conflict between the two. Thus, the treatment of a general repealer clause does not differ from the rules applicable to a repeal by implication. The fundamental rule of that doctrine is that a repeal by implication is not favored and

is never allowed except when there is such an invincible repugnancy between the provisions that both cannot stand. Repeal by implication is not a favored device in our interpretation of statutes, and we must construe all statutes relating to the same subject matter together. "[A] repeal by implication is accomplished where the Legislature takes up the whole subject anew and covers the entire ground of the subject matter of a former statute and evidently intends it as a substitute, although there may be in the old law provisions not embraced in the new." Hence, the older act will be "repealed" if it is apparent that the latter act was intended to substitute for the prior one.

*Doe v. Baum*, 348 Ark. 259, 274-75, 72 S.W.3d 476, 484-85 (2002) (internal citations omitted).

This court is firmly convinced that a repeal by implication in the case of constitutional provisions is even more suspect and difficult to achieve because we are dealing with the will of the voters and not the intent of legislators, who better understand the niceties of repealing and amending statutes. Even so, applying these rules for statutory construction to the construction and interpretation of the constitutional amendments involved in this case, this court first looks to the intent of the two constitutional amendments at issue by considering the *Doe* factors. Amendment 78 was passed only four years after the Arkansas voters had adopted Amendment 74 to the Arkansas Constitution. At the time Amendment 78 was adopted, the constitutionality of school funding for the Arkansas public school system was the subject of the *Lake View* litigation. In that climate, it is unreasonable to conclude that the voters intended to divert money exclusively dedicated for school purposes under Amendment 74 to fund redevelopment projects under Amendment 78. The purposes of the two amendments were categorically different.

We conclude that an invincible repugnancy between Amendment 74 and Amendment 78 does not exist so as to cause a repeal by implication. We note, as a collateral point, that funding for the City's redevelopment project was considered feasible with an applicable ad valorem rate of 3.16 mills even without the inclusion of the 25 mills authorized by Amendment 74 and that the redevelopment-district bonds apparently have been sold. Thus, the redevelopment project was funded and the bonds sold without the use of the 25 mills under Amendment 74, which the City now argues is vital and essential for funding the TIF district.

We hold that Amendment 78 did not alter Amendment 74, and we affirm the circuit court's conclusion on this point.

### III. Redevelopment Act and 25 Mills

As a related point, the City next asserts that the General Assembly's Redevelopment Act was amended twice to show that Amendment 74's 25 mills should be included in the TIF formula. *See* Act 2231 of 2005, now codified at Ark. Code Ann. § 14-168-301(18)(A) (Supp. 2005) (adding "state" taxes for purposes of TIF funding); Act 43 of 2003, now codified at Ark. Code Ann. § 14-168-323 (Supp. 2005) (removing incremental value in a redevelopment district for purposes of computing school-district funding). According to the City, these statutory amendments help clarify the original intent of the General Assembly, when it proposed Amendment 78 as an initiated act. The City argues, moreover, that the School District and Washington County actually levy the 25 mills and, thus, the 25 mills should be included within the applicable ad valorem rate for purposes of funding the redevelopment project, since that millage is levied by a "taxing unit." Finally, it claims that the 25 mills are a "general property tax" under the total ad valorem rate in the original Redevelopment Act. *See* Ark. Code Ann. § 14-168-301(17) (Supp. 2001).

We initially agree with the Arkansas Director of Finance and Administration that it is axiomatic that the General Assembly cannot amend the Arkansas Constitution, and specifically Amendment 74, by legislative enactments. *See, e.g., Arkansas Dept. of Corr. v. Bailey*, 368 Ark. 518, 247 S.W.3d 851 (2007) (noting that statutes are presumed to be framed in accordance with the Constitution); *Johnson v. Cummings*, 281 Ark. 229, 663 S.W.2d 168 (1984). In addition, it is constitutionally impermissible to interpret Amendment 78 as conferring upon the General Assembly the authority to repeal in part a constitutional provision like Amendment 74 for purposes of redesignating any portion of the 25 mills for a use other than the maintenance and operation of the public schools. We further agree with the Director that to the extent any of the legislation cited by the City authorizes the diversion of the 25 mills for a different purpose other than the maintenance and operation of our public schools, that legislation would be unconstitutional.

Nor can we agree, as already discussed, that Amendment 78 empowers the General Assembly to divert the uniform rate of 25 mills under Amendment 74 for TIF funding by later

legislation. The 25 mills under Amendment 74, as the circuit court correctly emphasized, is a tax adopted by the collective voters of the state, who levied the uniform rate of 25 mills as a matter of constitutional law when they approved Amendment 74. Hence, we hold that any increase or decrease in this uniform rate of tax or diversion of this tax for any other purpose must be submitted to the voters of this state for approval at a general election.

■ We hold, furthermore, that the 2003 and 2005 amendments to the Redevelopment Act provide no gauge of the intent of the voters when they adopted Amendment 78 in 2000. When interpreting the language of a provision of the Arkansas Constitution, this court endeavors to effectuate the intent of the people passing the measure. *See Harris v. City of Little Rock,* 344 Ark. 95, 40 S.W.3d 214 (2001). We have said that legislative interpretation of constitutional provisions is never binding on the courts, and when there is some doubt or ambiguity in the provision, legislative interpretation is persuasive and only entitled to *some* consideration. *See Mears v. Hall,* 263 Ark. 827, 569 S.W.2d 91 (1978). There is no doubt or ambiguity in our reading of Amendment 74 and Amendment 78. Moreover, it is clearly beyond the authority of the General Assembly to amend a constitutional provision by a legislative act that runs counter to the express language of that provision.

### IV. Library Cross-Appeal

The Library urges, for its cross-appeal, that the circuit court erred in finding that the proceeds of one mill from the Amendment 30 tax for libraries was properly included in the Assessor's Certification of the total ad valorem rate.[8] This is the same issue raised by the City as point four in its appeal, but we choose to discuss the issue under the Library's cross-appeal.

The Library first contends that the one mill should not have been included in the Assessor's certification for the redevelopment district financing, because Amendment 30 states that proceeds of taxes for the maintenance of public libraries "shall be . . . used only for that purpose." Ark. Const. amend. 30, § 2. In addition to its reliance on Amendment 30, the Library also relies on certain

---

[8] The Library notes that in October of 2002, Fayetteville voters voted to replace a one mill county library tax with a one mill city library tax.

provisions of Act 2231 of 2005, now codified at Ark. Code Ann. § 14-168-301(18)(B)(ii) (Supp. 2005). We decide this issue, however, based on Amendment 30.

The City's argument with respect to Amendment 30 is much like its argument relating to Amendment 74. It maintains that Amendment 78 did not totally repeal Amendment 30 but only worked a "slight modification" to its language that the one mill be used "for the purpose of maintaining and operating a public city library . . . ." Ark. Const. amend. 30, § 1. The City claims, as a result, that the modification required by Amendment 78 is such that although the existing mill rate is left untouched as to the current assessed value of property within a redevelopment district, "any increase in the assessed value of property in the area obtaining after the effective date of the ordinance approving the redevelopment plan for the district shall be used to pay any indebtedness incurred for the redevelopment project . . . ." Amend. 78 § 1(d). The City explains that everywhere throughout the state, except for the properly enacted redevelopment districts, the full sweep of Amendment 30's provisions remain in full force and effect. The City again points to the general repealer clause in Amendment 78 and black-letter law that a more recent constitutional amendment necessarily supersedes or implicitly repeals an earlier provision. The City argues that although the General Assembly could have easily added the Amendment 30 millages to the exclusion for debt service in Amendment 78, it did not. It concludes that the General Assembly possessed full knowledge of the constitutional scope of its power and certainly of the effect that Amendment 78 had on Amendment 30. Accordingly, the City presumes that the General Assembly and the voters wanted part of the mills in Amendment 30 to be diverted from the libraries for redevelopment financing.

The City's argument fails again for the same reason that it did concerning Amendment 74. Amendment 30 provides, in pertinent part: "The proceeds of any tax voted for the maintenance of a city public library shall be segregated by the city officials and used *only for that purpose.*" Ark. Const. amend. 30, § 2 (emphasis added). Again, there is no notice to the voters that by adopting Amendment 78, it would in any way impair the funding for public libraries under Amendment 30. *See City of Hot Springs, supra.*

We reverse the circuit court on cross-appeal.

Affirmed in part. Reversed and remanded in part. Reversed and remanded on cross-appeal.