Cite as 2024 Ark. App. 540

# ARKANSAS COURT OF APPEALS

DIVISION II

No. CV-22-515

|  |  |
|---|---|
| ARKANSAS BLUE CROSS AND BLUE SHIELD | **Opinion Delivered** November 6, 2024 |
| APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FIFTH DIVISION [NO. 60CV-21-2725] |
| V. | |
| | HONORABLE WENDELL GRIFFEN, JUDGE |
| FREEWAY SURGERY CENTER; SCOTT SCHLESINGER, M.D.; FAIR PARK SURGERY CENTER; CENTERVIEW SURGERY CENTER; SOUTH ARKANSAS SURGERY CENTER; ADVANCED AMBULATORY SURGERY CENTER; EXECUTIVE PARK SURGERY CENTER OF FORT SMITH; GASTROENTEROLOGY AND SURGERY CENTER OF ARKANSAS; MOUNTAIN HOME SURGERY CENTER; HARRISON SURGERY CENTER; BOZMAN-HOF EYE CENTER; PHYSICIANS DAY A/K/A MCFARLAND EYE CENTER; SPRING CREEK SURGERY CENTER; TAYLOR PLASTIC SURGERY; SURGERY CENTER OF NORTHEAST TEXAS; ADVANCED INTERVENTIONAL PAIN MANAGEMENT; PRECISION SURGICAL OF NORTHWEST ARKANSAS; EXECUTIVE SURGERY CENTER OF LITTLE ROCK; CENTRAL ARKANSAS SURGERY CENTER A/K/A ARKANSAS SPINE AND PAIN; ARKANSAS CENTER FOR SURGICAL EXCELLENCE | REVERSED |
| APPELLEES | |
| AND | |
| ALAN MCCLAIN, ARKANSAS INSURANCE COMMISSIONER | |
| INTERESTED PARTY | |

## ROBERT J. GLADWIN, Judge

This appeal arises from the December 20, 2021 memorandum order issued by the Pulaski County Circuit Court reversing and remanding the April 8, 2021 declaratory order No. 2020-069A issued by the Arkansas Insurance Commissioner ("Commissioner") regarding the meaning of a statute enacted in 1977—specifically, Arkansas Code Annotated section 23-79-115 (Repl. 2014) ("Section 115"). Appellant Arkansas Blue Cross and Blue Shield ("ABCBS") argues that the Commissioner properly concluded that Section 115 does not apply to network participation agreements between insurance companies and licensed outpatient/ambulatory surgery centers and argues further that the Commissioner's decision should be affirmed because the "Any Willing Provider" ("AWP") laws have impliedly repealed any application of Section 115 to network participation agreements. We reverse the circuit court's memorandum order and affirm the Commissioner's declaratory order.

### I. *Facts and Procedural History*

On October 10, 2019, multiple Arkansas licensed outpatient/ambulatory surgery centers ("Surgery Centers") filed a complaint with the Arkansas Insurance Department ("AID") alleging noncompliance by ABCBS with Section 115 in that, pursuant to that statute, it was unlawful for ABCBS to negotiate with Surgery Centers for rates of payment for services provided to its members that were lower than rates negotiated with full-service hospitals. They asked the AID to declare that Section 115 regulates the separate and distinct network participation agreements between insurance companies and Surgery Centers. The AID forwarded the complaint to ABCBS on October 16.

2

On November 6, ABCBS responded and denied the allegations in the complaint, explaining that Medicare pays Surgery Centers and full-service hospitals differently, with hospital-payment rates being higher. ABCBS asserted that Section 115 does not require parity in contracted rates between Surgery Centers and hospitals. ABCBS stated that Section 115 applies to the insurance contracts between insurance companies and insureds but not to the separate contractual relationships between insurance companies and healthcare providers. Pointing to the historical development of Section 115, ABCBS explained that the statute was aimed at ensuring that Arkansas insurance policyholders were given equal coverage for services regardless of whether they were provided by hospitals or Surgery Centers.

On November 12, a market analysis chief with the AID wrote a letter to ABCBS finding in favor of the Surgery Centers stating:

> The [AID] disagrees with ABCBS's interpretation of Ark. Code Ann. § 23-79-115. Namely, that "person entitled to payment or reimbursement under the policy" applies to the member/insured and not the provider/facility. It is the [AID]'s position that the plain language of § 23-79-115 requires payment or reimbursement for healthcare services provided by hospitals or related facilities be made on an equal basis when the service is provided by outpatient surgery centers.

Three days later, the AID's managing counsel reached out to other insurance providers asking them about their payment practices "to decide whether section 23-79-115 applies to require reimbursement parity." In response to a request from managing counsel, ABCBS provided evidence to show that it provided coverage to its member insureds for services provided by Surgery Centers and hospitals on an equal basis. On November 22, the

3

AID withdrew the November 12 letter regarding its interpretation of Section 115 for the purpose of submitting the issue for "an administrative declaration or hearing." The Commissioner appointed the Honorable Ellen Brantley, a retired circuit court judge, to preside over the matter as a hearing officer.

In the summer of 2020, an issue arose regarding the promulgation of the AID's rules of procedure for a declaratory hearing. Out of an abundance of caution, the AID adopted a new set of rules of procedure and instructed the Surgery Centers to refile a new complaint under the new rules. On October 22, 2020, the Surgery Centers filed a petition for declaratory relief and damages against ABCBS, which ABCBS again denied.[1]

On January 7, 2021, the Commissioner issued an amended order stating that the Surgery Centers' petition dated back to the original filing on October 26, 2019. The January 7 order also bifurcated the matter into two separate actions and provided that phase I would determine (1) whether Section 115 applies to private network participation agreements between insurance companies and licensed outpatient/ambulatory surgery centers, and (2) if Section 115 is found to be applicable to those agreements, then whether Section 115 has been affected or superseded by other subsequently enacted state law, including but not limited to the Patient Protection Acts (now commonly known as the AWP laws). It also provided that phase 2 would proceed forward only if it is determined that Section 115 applies

---

[1]The Commissioner's January 7, 2021 amended order deemed the Surgery Centers' petition filed as of January 10, 2021, making a final order on phase 1 due on or before April 10, 2021.

4

to private network participation agreements between insurance companies and licensed outpatient/ambulatory surgery centers and that the question to be answered would be "what is the meaning of 'equal basis' as that phrase is used in Ark. Code. Ann. § 23-79-115."

Hearing Officer Brantley permitted the parties to submit simultaneous briefs. The Surgery Centers and ABCBS submitted their initial briefs on January 12 and their reply briefs on February 4.

On March 9, Hearing Officer Brantley conducted a hearing on the phase I issues. No witnesses testified at the hearing, but arguments were heard from counsel for both parties. On April 8, Hearing Officer Brantley issued her order including findings of fact and conclusions of law determining that (1) Section 115 was inapplicable to network participation agreements, and that even if it had applied, (2) Section 115 was impliedly and substantively repealed by the AWP laws. Hearing Officer Brantley made the factual finding that Section 115 applied to regulate insurance-company contracts with insured policyholders, not network agreements between insurance companies and healthcare providers. The finding was supported by the historical facts that (a) when Section 115 was passed in 1977, network agreements between insurance companies and healthcare providers were not allowed outside of health maintenance organizations, and (b) the AID had no jurisdiction to regulate network agreements until the AWP laws were passed in 2005. Additionally, Hearing Officer Brantley explained that uniformity in payment is not required under the AWP laws, noting the AID's earlier explanation that insurance companies can vary payments to various healthcare facilities depending on cost or for quality reasons.

5

Also on April 8, the Commissioner signed declaratory order No. 2020-069A in which he "adopt[ed] the Hearing Officer's Findings of Fact, Conclusions of Law, and Recommendations in *PART.*" (Emphasis in the original.) The Commissioner did not specify which of the findings of fact or conclusions of law were being adopted. As to the recommendations, the Commissioner accepted Hearing Officer Brantley's recommendation that Section 115 does not apply to network participation agreements, but he did not address the recommendation that the AWP laws had impliedly and substantively overruled Section 115. The Commissioner's order stated, "Because the [AID] rules that Ark. Code Ann. § 23-79-115 does not apply to private contracts between insurers and licensed outpatient/ambulatory surgery center, there is no reason for the [AID] to take up any secondary declaratory actions." Accordingly, there was no final ruling from the Commissioner on the effect of the AWP laws on Section 115.

The sole issue that the Surgery Centers appealed to the Pulaski County Circuit Court on May 3, and that is now before us, is the plain meaning of Section 115 and its applicability to network participation agreements. After the parties presented oral arguments on December 7, the circuit court entered a memorandum order on December 20, reversing the Commissioner's declaratory order that Section 115 was inapplicable to network participation agreements—based solely on the language of the statute and without reference to the Commissioner's supporting findings of facts and conclusions of law—and remanding the case for further adjudication on the second issue of the bifurcated matter, the effect of the AWP laws on Section 115. ABCBS timely filed its notice of appeal on January 18, 2022.

6

## II. *Standard of Review*

Although the circuit court ruled on this matter, this court's review is directed toward the order of the administrative agency. *See Landmark Novelties, Inc. v. Ark. State Bd. of Pharmacy*, 2010 Ark. 40, at 6, 258 S.W. 3d 890, 895. We may reverse the agency decision if the substantial rights of the parties against whom the agency ruled have been prejudiced because the ruling is (1) in violation of the constitutional or statutory provisions; (2) in excess of the agency's statutory authority; (3) made upon unlawful authority; (4) affected by other error or law; (5) not supported by substantial evidence; or (6) arbitrary, capricious, or characterized by abuse of discretion. Ark. Code Ann. § 25-15-212(h) (Repl. 2024); *see Crain Fam. Holdings, LLC v. Ford Motor Co.*, 2021 Ark. App. 361, at 3–4, 635 S.W.3d 346, 348.

Findings of fact determined by the Commissioner are conclusive if they are supported by substantial evidence. Ark. Code Ann. § 23-61-307(g)(2) (Repl. 2023). To establish an absence of substantial evidence, the challenging party "must demonstrate that the proof before the administrative tribunal was so nearly undisputed that fair-minded persons could not reach its conclusion." *Ark. Ethics Comm'n v. Weaver*, 2021 Ark. 38, at 4, 617 S.W.3d 680, 683. If the decision is supported by substantial evidence, it follows that it was not arbitrary and capricious. *Id.* When the agency interprets a statute, the appellate court reviews that interpretation de novo. *Myers v. Yamato Kogyo Co., Ltd.*, 2020 Ark. 135, at 5, 597 S.W.3d 613, 617. The interpretation of an unambiguous statute is based on the clear meaning of the text, but if an ambiguity exists, the agency's interpretation will be one of the tools to provide guidance. *Id.* at 5–6, 597 S.W.3d at 617.

III. *Applicable Law*

Whether Section 115 applies to network participation agreements is a matter of statutory interpretation. The basic rule of statutory construction is to give effect to the intent of the legislature. *Pulaski Cnty. Special Sch. Dist. v. Lewis*, 2017 Ark. App. 264, at 7, 521 S.W.3d 142, 147. If the language of a statute is clear and unambiguous and conveys a clear and definite meaning, it is unnecessary to resort to the rules of statutory construction. *City of N. Little Rock v. Pfeifer*, 2017 Ark. 113, at 5, 515 S.W.3d 593, 597. In these situations, courts are to construe a statute just as it reads, giving the words their ordinary and usually accepted meaning. *Ark. Ethics Comm'n*, 2021 Ark. 38, at 5, 617 S.W.3d at 683; *Simpson v. Calvary SPV I, LLC*, 2014 Ark. 363, at 3, 440 S.W.3d 335, 338. When the language of a statute is clear, courts will not search for legislative intent; rather, intent must be gathered from the plain meaning of the language used. *Roberson v. Phillips Cnty. Election Comm'n*, 2014 Ark. 480, at 4, 449 S.W.3d 694, 696; *see also 3 Rivers Logistics, Inc. v. Brown-Wright Post No. 158*, 2018 Ark. 91, at 5, 548 S.W.3d 137, 141.

Legislative intent is informed by the whole act as well as other statutes on the same subject. *Holbrook v. Healthport, Inc.*, 2014 Ark. 146, at 5–6, 432 S.W.3d 593, 597; *Weiss v. Maples*, 369 Ark. 282, 286-87, 253 S.W.3d 907, 911–12 (2007). Legislative history, the language of the statute, and the subject matter involved all inform legislative intent. *Weiss*, 369 Ark. at 286, 253 S.W.3d at 911–12. Statutes will not be interpreted in a way that "leads to absurd consequences that are contrary to legislative intent." *Lewis*, 2017 Ark. App. 264, at 7, 521 S.W.3d at 148.

In construing a statute, this court "must try to discern what the legislature intended *when it passed the statute.*" *Ark. Tobacco Control Bd. v. Santa Fe Nat. Tobacco Co., Inc.*, 360 Ark. 32, 39, 199 S.W.3d 656, 659 (2004) (emphasis added); *see also Richard v. Union Pac. R.R. Co.*, 2012 Ark. 129, at 5, 388 S.W.3d 422, 425 (stating that in ascertaining the drafter's intent, courts often examine the conditions contemporaneous to the statute's enactment); *City of Fayetteville v. Washington Cnty.*, 369 Ark. 455, 473, 255 S.W.3d 844, 857 (2007) (holding that when interpreting the language of a provision of the Arkansas Constitution, appellate courts endeavor to effectuate the intent of the people passing the measure).

Arkansas statutes are not "living" documents; rather, a statute requires "a consistent and uniform interpretation so that it is not taken to mean one thing at one time and something else at another time." *Morris v. McLemore*, 313 Ark. 53, 5, 852 S.W.2d 135, 136 (1993). The construction given a statute, when consistently followed, "ought not be changed." *Id.* (citing *Sw. Ark. Commc'ns, Inc. v. Arrington*, 296 Ark. 141, 753 S.W.2d 267 (1988)). In fact, as time passes, "the interpretation given a statute becomes a part of the statute itself." *Id.* (citing *Gibson v. Gibson*, 264 Ark. 418, 572 S.W.2d 146 (1978)). Therefore, once a governing body has given effect to the drafting body's intent, that intent "ought not change" with time. *See Appleby Rd. Street Imp. Dist. v. Powell*, 282 Ark. 398, 400, 669 S.W.2d 3, 4 (1984) (noting, however, that if a new statute adopts the language of an earlier enactment, it also adopts prior interpretations of that language). Should the Arkansas General Assembly disagree with how a statute is interpreted and applied, the proper remedy is statutory amendment. *See Lawhon Farm Servs. v. Brown*, 335 Ark. 272, 281, 984 S.W.2d 1,

9

5 (1998) (noting that without such amendments, interpretations of the statutes remain the law).

In addition to these statutory-construction rules, a court must also apply a liberal construction to the statute and its words because Section 115 is a remedial statute. Statutes that are enacted for the public benefit are to be construed liberally to effectuate the public benefit intended by the statute. *Harris v. City of Fort Smith*, 359 Ark. 355, 360, 197 S.W.3d 461, 464 (2004).

Moreover, courts must construe a statute so that no word is left void, superfluous or insignificant and to give meaning and effect to every word in the statute, if possible. *Smith v. ConAgra Foods, Inc.*, 2013 Ark. 502, at 3, 431 S.W.3d 200, 202; *Ward v. Doss*, 361 Ark. 153, 159, 205 S.W.3d 767, 770 (2005).

IV. *Discussion*

Arkansas Code Annotated section 23-79-115, or Section 115, is part of a statutory regime governing insurance contracts between insurance companies and Arkansas citizens with health insurance policies. *See, e.g.*, Ark. Stat. Ann. § 66-3212 (Repl. 1966). In 1977, an iteration of what is now Section 115 was adopted through an amendment to Arkansas Statutes Annotated section 66-3212. *See* Act 232 of 1977. The statute addressed the rights of insureds regarding outpatient surgery centers in the chapter of the Arkansas Code titled "Insurance Policies Generally":

> [T]he person entitled to payment, or reimbursement or services under such policy, contract, plan or agreement is entitled to payment or reimbursement on an

equal basis for such service when the said service is provided by facilities licensed as outpatient surgery centers[.]

*See* Act 232, § 1. The critical language in the 1977 amendment mirrors the language of the current version of Section 115, which remains in the "Insurance Policies" chapter of the Arkansas Code and now reads, in pertinent part, as follows:

> (a)(1) Notwithstanding any provisions of any individual or group accident and health insurance policy, *or any provision of a policy, contract, plan, or agreement covering hospital or medical services*, in cases in which the policy, contract, plan, or agreement provides for payment or reimbursement for any healthcare service provided by hospitals or related facilities as defined in § 20-9-201 or § 20-10-213, *the person entitled to payment or reimbursement for services under the policy, contract, plan, or agreement is entitled to payment or reimbursement on an equal basis for the service when the service is provided by facilities licensed as outpatient surgery centers under §§ 20-9-214 and 20-9-215.*

> (2) This subsection applies to insurance policies and hospital service corporation contracts that are delivered or issued for delivery in this state more than one hundred twenty (120) days after July 6, 1977, *and to such other contracts, plans, or agreements that are entered into or effectuated in this state more than one hundred twenty (120) days after July 6, 1977.*

Ark. Code Ann. § 23-79-115(a)(1), (2) (emphasis added); *see* Ark. Stat. Ann. § 66-3212(10) (Repl. 1980).

Despite being the law since 1977, Section 115 has not been cited, interpreted, or construed by the courts of this state. This is also not an issue for which there is a history of interpretation or enforcement by the AID. An AID lawyer acknowledged during this case that the AID had no history of interpreting or dealing with Section 115 in the twenty-five years he has been employed by the AID.

11

In 2001, the General Assembly made some technical changes to the statute, reinforcing that the statute addressed "rates of *insurance policy reimbursement* for services[.]" *See* Act 1604 of 2001, § 93 (emphasis added).

Section 115 was enacted at a time when health insurance in Arkansas operated under indemnity plans through which insurance companies indemnified their insureds and paid or reimbursed them for covered costs and expenses. Contracts directly between insurance companies and healthcare providers did not exist at that time, except that in 1975, the General Assembly enacted laws to govern Health Maintenance Organizations ("HMOs") with the intent that, when properly regulated, HMOs would encourage proper care while containing costs. *See* Ark. Code Ann. § 23-76-101(a) (Repl. 2014). HMOs, however, were exempt from the general provisions of Arkansas's insurance statutes. *See HMO Ark., Inc. v. Dunn*, 310 Ark. 762, 765, 840 S.W.2d 804, 806 (1992) (citing Ark. Code Ann. § 23-76-104).

In 1985, nearly a decade after Section 115 was enacted, Arkansas first allowed insurance companies to contract with healthcare providers and create networks of what is commonly referred to as Preferred Provider Organizations ("PPOs"). *See* AID Bulletin No. 9-85 (May 10, 1985)[2] (explaining that before May 10, 1985, the AID's opinion was that "insurers could not contract directly or indirectly with providers of health care services" without forming a health maintenance organization). The advent of the PPO created new

---

[2]https://portal.insurance.arkansas.gov/LegalPubsPublic/Documents/Bulletins/bulletin_9-85.pdf, archived at https://perma.cc/P8SY-V326.

12

opportunities for providing efficient and affordable healthcare to Arkansans. A PPO has two separate contractual arrangements: (1) the insureds' contracts with insurance companies for healthcare coverage and (2) insurance companies' contracts with healthcare providers to create networks of preferred providers.

In 1995, a decade later, the General Assembly comprehensively regulated these network agreements between insurance companies and healthcare providers, passing the first version of Arkansas's AWP laws (then titled the Patient Protection Act of 1995). *See* Ark. Code Ann. **§§** 23-99-201 to -209 (Repl. 2013 & Supp. 2023). But in 1997, the AID recognized that, even though it was tasked with enforcing provisions under Arkansas's insurance laws, "the [AID] [did] not have jurisdiction or regulatory authority over the [network agreements] since these agreements are, properly, matters of private contract between the parties." *See* AID Directive No. 1-98 (January 9, 1998)[3]. At that time, the AID was tasked with enforcing Section 115 and, in doing so, recognized that Section 115 was inapplicable to network agreements.

Then in 2005, the General Assembly amended the AWP laws to provide new details regarding their application, construction, and enforcement. *See* Ark. Code Ann. **§§** 23-99-801 to -803 (Repl. 2013 & Supp. 2023). Section 115 remained in the chapter of the Arkansas Code titled "Insurance Policies," while the AWP laws were located in the chapter titled "Healthcare Providers." The 2005 AWP amendments specifically gave the AID jurisdiction

---

[3]https://www.insurance.arkansas.gov/site/assets/files/2614/1-1998_balance_billing .pdf, archived at https://perma.cc/N7U8-WD3T.

to enforce the AWP laws and, therefore, the power to regulate network participation agreements. *See* Ark. Code Ann. § 23-99-803 (Repl. 2013).

That context and history are relevant in that they support why Hearing Officer Brantley and then the Commissioner ruled that Section 115 does not apply to network participation agreements. Two critical points were cited: (1) Section 115 was enacted nearly a decade before network participation agreements were allowed, foreclosing any argument that the General Assembly intended Section 115 to apply to those contracts; and (2) after network participation agreements were allowed, the General Assembly passed additional laws specifically regulating those contracts. ABCBS argues that these two uncontradicted factual points confirm, as the Commissioner ruled, that Section 115 does not apply to networks contracts.

When Section 115 was enacted in 1977, not only did network participation agreements not exist, but they were also prohibited by law. *See* AID Bulletin No. 9-85. Accordingly, ABCBS argues that the General Assembly could not have intended for the statute to regulate network agreements. *See Ark. Tobacco Control Bd.*, 360 Ark. at 39, 199 S.W.3d at 659 (discerning legislative intent as of the time a statute is passed). And such an intent cannot be conjured from the mere passage of time. *See Morris*, 313 Ark. at 54, 852 S.W.2d at 136 (providing statutes are to be given consistent interpretations over time).

The AID explained that although Section 115 was within its jurisdictional authority, it did not have the authority to regulate network agreements until 2005. ABCBS argues, and we agree, that applying an unprecedented new principle to Section 115 after more than four

14

decades of contrary treatment and lack of regulatory interpretation otherwise would conflict with the legislative intent, plain statutory interpretation, rules of statutory construction, and common sense. *See Bowmaster v. City of Jacksonville*, 2016 Ark. App. 572, at 7, 507 S.W.3d 526, 530 (explaining that the General Assembly is presumed to be familiar with interpretations of statutes, and without amendment, the prevailing interpretation remains the law).

The Surgery Centers challenge the findings by the Commissioner, asserting that by its plain language, Section 115 applies to "any provision of a policy, contract, plan, or agreement covering . . . *medical services*." Ark. Code Ann. § 23-79-115 (emphasis added). They disagree with the interpretation ultimately adopted by the Commissioner that Section 115 applies only to insurance policies and plans and not to "any provision of a policy, contract, plan, or agreement covering . . . medical services." The Surgery Centers contend that AID's reading ignores that critical quoted language of Section 115 and renders it superfluous and meaningless. They submit that had the General Assembly intended for Section 115 to apply solely to insurance policies or plans, it could have omitted the "or" and then the phrase "any provision of a policy, contract, plan, or agreement covering . . . medical services."

The Surgery Centers next address ABCBS's questions as to whether Section 115 was intended to benefit providers as opposed to merely the insureds. Again, they note the phrase in Section 115, "the person entitled to payment or reimbursement for services under the policy, contract, plan, or agreement," and argue that the "person entitled to payment for services" can only mean the provider.

Finally, the Surgery Centers note that through the plain language of Section 115, the General Assembly created a statute that applied to the form of contracts that existed in 1977 as well as those that would come thereafter. The express language of the statute states it is applicable to "such other contracts, plans, or agreements that are entered into or effectuated in this state more than one hundred twenty (120) days after July 6, 1977." Accordingly, the Surgery Centers argue that it is irrelevant that network participation agreements did not exist in 1977.

The Surgery Centers' plain-language argument is flawed because it is a review of the plain language of the statute in question without regard to context. As the Arkansas Supreme Court has explained, plain-language construction yields to the most fundamental rule, which is that the court must give effect to the intent of the legislature. *Doe v. Baum*, 348 Ark. 259, 274, 72 S.W.3d 476, 484 (2002). To ascertain intent, even when looking at the plain language, the court "examines the statute historically, as well as the contemporaneous conditions at the time of the enactment, the object to be accomplished, the remedy to be provided, the consequences of interpretation, and matters of common knowledge within the court's jurisdiction." *Id.*; *see also Washington Reg'l Med. Ctr. v. Nw. Physicians, LLC*, 2018 Ark. App. 497, at 6–7, 562 S.W.3d 239, 244.

The Surgery Centers' contention that context is irrelevant belies this court's history of statutory construction and ignores the legislative intent behind Section 115. The Surgery Centers fail to address that this court reviews the conditions contemporaneous to the enactment of a statue when determining legislative intent. *See Ark. Tobacco Control Bd.*, *supra*

(interpreting a statute in 2004 by regarding legislative intent in 1977 prior to technological advancements noting courts must try to discern what the legislature intended when it passed the statute); *see also Richard*, 2012 Ark. 129, at 5, 388 S.W.3d at 425 (applying same temporal rule of construction to interpreting an Arkansas Rule of Civil Procedure).

The Surgery Centers fail to consider that provider networks were prohibited by law at the time, s*ee* AID Bulletin No. 9-85, and do not attempt to justify reading the plain language of the statute in a manner that indicates it applies to contracts prohibited by law. Arkansas law states that it will not aid in enforcement of illegal contracts. *See Wilson v. Adkins*, 57 Ark. App. 43, 45, 941 S.W.2d 440, 440 (1997) (holding it is firmly established that the law will not aid in the enforcement of illegal and void contracts). We agree with ABCBS's argument that the plain language of Section 115 supports that the General Assembly wanted to protect insureds on a going-forward basis, regardless of the nature of the agreement, but hold that the record does not support that it intended for the statute to protect providers in connection with future illegal contracts.

The plain language of Section 115 reveals that the legislature envisioned the procedure at the time of enactment whereby payment was to a "person"—the insured—rather than to an entity. At that time, typically insureds would be "reimbursed" for payments made by them to medical providers, and the General Assembly's desire was to protect insureds from insurance companies refusing a claim due to the insured's inability to initially pay the claim and then seek reimbursement. The phrase "payment or reimbursement" in Section 115 was to protect the insured regardless of the timing of the insured's payment for services—

17

i.e., the insured is protected if he or she pays a provider and seeks reimbursement as well as if he or she is billed by a provider and initially seeks payment from the insurance company.

Moreover, the historical facts and context also affect our analysis of whether the statute is ambiguous on its face. A statute is ambiguous when it is open to two or more reasonable constructions. *See Wickham v. State*, 2009 Ark. 357, at 5–6, 324 S.W.3d 344, 347. Here, the Surgery Centers and ABCBS have offered different interpretations based on the AID, Hearing Officer Brantley, and finally, the circuit court all opining various interpretations of the relevant statute. There has been no solid consensus, and the differing interpretations lend to a finding that Section 115 is ambiguous. And where ambiguity exists, the agency's interpretation provides guidance to this court. *Myers, supra*.

Despite the analysis looking beyond the four corners of the statute and beyond the plain and ordinary meaning of the words of the statute, we disagree that the Commissioner's analysis was improper under these circumstances. ABCBS's argument—and the analysis adopted by the Commissioner—is more than merely a policy argument as to why Section 115 should not apply to network participation agreements. Rather, they reflect an accurate review of the legislative intent when Section 115 was originally enacted.

Because the record supports the Commissioner's ruling that Section 115 does not apply to the network participation agreements based on the statutory language and the intent of the General Assembly when it was enacted, we need not reach the issue of whether the Commissioner erred in reviewing the impact of the AWP laws in the initial determination of whether Section 115 applies to network participation agreements. Likewise, we do not

18

address whether the AWP laws impliedly repealed Section 115 because there is no ruling from either the Commissioner or the circuit court before us on appeal.

For the above-stated reasons, we reverse the circuit court's December 20, 2021 memorandum order and affirm the Commissioner's April 8, 2021 declaratory order No. 2020-069A.

Reversed.

HARRISON, C.J., and BROWN, J., agree.

*Quattlebaum, Grooms & Tull PLLC*, by: *Steven W. Quattlebaum* and *Joseph R. Falasco*, for appellant.

*Butler Snow LLP*, by: *Daniel W. Van Horn*, for appellees.