## PHILLIPS PETROLEUM COMPANY *v.*
### RICHARD R. HEATH, DIRECTOR, DEPARTMENT OF FINANCE AND ADMINISTRATION

73-66                                          497 S.W. 2d 30

### Opinion delivered July 9, 1973

*William S. Mitchell, Lloyd G. Minter, Kenneth Heady* and *Charles E. Daniels,* for appellant.

*Walter Skelton, Karl Glass* and *J. B. Nash,* for appellee.

JOHN A. FOGLEMAN, Justice. This appeal involves the construction of the severance tax act. See Ark. Stat. Ann. § 84-2101, et seq. (Repl. 1960). The chancery court held that the tax levied by the act applied to oil produced by appellant and consumed by it in a recovery procedure by which it injected steam into the producing sands in its unit for the purpose of raising both temperature and pressure, thereby substantially increasing the crude oil production from its wells. We agree with the chancellor's conclusion.

Phillips Petroleum Company is engaged in exploring for, producing, refining and marketing oil and oil products. It is burning a part of the oil produced by it to generate the steam injected into the earth at the level of its oil-producing sands for the purpose of reducing the viscosity and improving the flow of oil into its wells. It brought this action to recover its payments of severance taxes on the oil so utilized made under protest and for a judgment declaring that oil hereafter used for these purposes is not subject to the tax. Appellant asserted in the trial court that this oil was not severed because it is not produced for commercial purposes.

The oil produced from appellant's wells is pumped into a storage tank, from which it is either sold to a purchaser or returned to a fuel storage tank from which the steam generator is supplied. Although the unit agreement under which appellant was operating permitted it to use crude oil, Phillips pays royalty on the oil burned in the operation. An auditor for the Arkansas Department of Finance and Administration testified that the tax collected was based on reports of sales filed by Phillips which included the oil burned, and broken down to show the quantity sold and the quantity burned. He said that the tax was to be paid at the time the oil left the storage tank.

Phillips states that it is not claiming an exemption from the tax for the oil burned, but does claim that the tax does not apply to it, and that any uncertainty about the application of the tax must be resolved in its favor.

It relies principally upon the case of *McLeod* v. *Kansas City Southern Ry. Co.*, 206 Ark. 281, 175 S.W. 2d 391, where we held that gravel mined by a railroad company and used by it for ballast on its tracks was not subject to tax. But we did not hold in *McLeod* that the tax did not apply because of the use to which the gravel was put. We held that the tax, being a privilege tax or occupation tax levied on all engaged in the business of severing natural resources for commercial purposes,[1] did not apply because the railroad company was not engaged in that occupation. The tax is specifically levied upon "each producer of natural resources." The railroad company was not. Appellant admittedly is. *McLeod* has no application to this case.

The tax is levied upon the *quantity* of oil "severed" at the rate of 5% of the "market value at time and point of severance." Ark. Stat. Ann. § 84-2102. "Sever" is defined by statute to mean "natural resources cut, mined, dredged, or otherwise taken or removed, for commercial purposes, from the soil or water," but does not apply to *natural gas* returned to any formation, in repressuring, pressure maintenance operation or other operation for the production of oil or any other liquid hydrocarbon. Ark. Stat. Ann. § 84-2101(c). The "time of severance" is defined as the date upon which transportation of natural resources has been or *is about to be commenced* for their *use* or processing after having been severed. *Ark. Stat. Ann.* § 84-2101(e). The "point of severance" is defined as the place where transportation of natural resources has been or *is about to be commenced* for *use* or processing after their having been severed. § 84-2101(d). It seems quite clear to us that, when the oil reached the storage tank, transportation was about to be commenced for its use, either by appellant for fuel or to the market for sale.

Appellant contends, however that the oil used to produce steam is not severed for commercial purposes, arguing that consumption of the oil by it is not a commercial purpose because it is not sold or traded. It takes the position that a severance is not for commercial pur-

[1] See *Floyd* v. *Miller Lumber Co.*, 160 Ark. 17, 254 S.W. 450, 32 A.L.R. 811; *Miller Lumber Co.* v. *Floyd*, 169 Ark. 473, 275 S.W. 741, aff'd, 273 U.S. 672, 47 S. Ct. 475, 71 L. Ed. 832 (1926).

poses unless the product is actually sold or placed on the market. We do not think that the General Assembly had any such narrow definition in view, nor do we find such a narrow construction of the words "commercial purposes" to be consonant with the legislative purpose and intent evidenced by other provisions of the act and by other legislative action. Neither do we take the holdings in *McLeod* v. *Kansas City Southern Ry. Co.,* supra, *Floyd* v. *Miller Lumber Co.,* supra, and *Miller Lumber Co.* v. *Floyd,* supra, to turn upon the fact that the resources involved were or were not disposed of on the market.[2] The determinative factor in those cases was the business in which the concerns from whom collection was sought were engaged. The same distinction also applies to *Scurlock* v. *Greene County,* 223 Ark. 507, 266 S.W. 2d 811. The question, of course, in those cases was not the use made of the products, as appellant suggests; it was the primary business of either concern involved. If the railroad company had engaged in the marketing of the products as a secondary business or even incidental to its primary business, a different question might well have been posed.

We are inclined to believe that the legislature had a broader definition in view and that the proper approach to determine the meaning to be given to these words is similar to that taken to arrive at the meaning of the same words by the Supreme Court of Utah in *Beard* v. *Board of Education of North Summit School Dist.,* 81 Utah 51, 16 P. 2d 900 (1932). In construing statutes in the absence of any indication of a different legislative intent, we give words their ordinary and usually accepted meaning in common language. *Kaiser* v. *Price-Fewell, Inc.,* 235 Ark. 295, 359 S.W. 2d 449, cert. denied, 371 U.S. 955, 83 S. Ct. 511, 9 L. Ed. 2d 501 (1962); *City of Fort Smith* v. *Hairston,* 196 Ark. 1005, 120 S.W. 2d 689. By resort to Webster's New International Dictionary, the Utah court found that the common dictionary meaning of the words was in harmony with the definitions accorded them in the de-

---

[2]Actually the *Miller Lumber Company* cases themselves are somewhat indicative of a different view because all the lumber companies involved were manufacturing lumber and other finished products, and considered the severance of timber only as an incidental step in the process.

cided cases. The dictionary definition of a commercial purpose might be stated as an objective, end, operation, design or intention pertaining to the exchange or buying and selling of commodities, and particularly the exchange of merchandise on a large scale between different places and communities. The *Beard* court found that, by application of this definition, other courts had found that the words encompassed more than the buying, selling and exchanging of commodities, and that the transportation of merchandise from *one place to another* was included within their scope as well as the idea that trade and commerce require the transfer of persons, commodities, or intelligence from *one place or person to another.* While quite a different problem was presented in *Beard,* the court found that the very words we are considering had a broader meaning than appellant would have us give them.

The first indication that the General Assembly did not intend that sale be the only commercial purpose contemplated appears in its use of the expression "sale, commercial gain or profit" in its obvious reaction to the *McLeod* decision by the proviso in Section 2 of Act 136 of 1947. See Ark. Stat. Ann. § 84-2102(h). We ourselves have evidenced our feeling that sale was not the exclusive commercial purpose envisioned in *Scurlock* v. *Greene County,* 223 Ark. 507, 266 S.W. 2d 811, when we emphasized that the county severed gravel for use of its highways and "not for sale or other commercial purpose."

If we follow the meaning we arrive at by analysis of dictionary definitions and if the oil in question was extracted from the soil with an objective, design and intention pertaining to the exchange or selling of a commodity (oil), then there was a severance. This was certainly the purpose of the extraction of the oil in question and its utilization to produce more oil from the earth is in fulfillment of that objective. The legislative intent that the products used by a producer such as appellant for the purpose of increasing its production in the manner utilized by appellant may be illustrated in several ways. The tax is calculated on the "market value" of the product, not its selling price. And then, the proviso incorporated into the act for the purpose of exempting such

severers of natural resources as use them for their own purposes, but not for "sale, commercial gain or profit" states that the tax does not apply to an *individual* who *occasionally* severs natural resources *from his own premises* to be utilized by him in the *construction, repair or maintenance* of his own structures or improvements. There is a further provision that the act does not apply to the producer of resources severed for the purpose of incorporation into a *structure* used in connection with any commercial business of the producer. Appellant is not contending that it comes within either of the above categories or that it was favored by a tax exemption. The point is that the act must be construed to have applied to the exempted producers or production in the absence of the provisos. The legislature will not be presumed to have done a vain and useless thing. Quite the opposite is true. *Wells, Fargo and Company's Express* v. *Crawford County*, 63 Ark. 576, 40 S.W. 710, 37 L.R.A. 371; 2 Horack's Sutherland, Statutory Construction, 327, § 4510; 50 Am. Jur. 358, § 357; 82 C.J.S. 551, Statutes, § 316. See *Henderson* v. *Gladish*, 198 Ark. 217, 128 S.W. 2d 257; 82 C.J.S. 652, Statutes, § 329. If, in the absence of these stated exemptions, the producers favored by them would have been liable for the tax, it seems clear to us that appellant is liable for the tax it seeks to avoid here in the absence of an exemption in its favor.

The significance of the omission of a specific exemption favoring appellant is magnified by two other factors, i.e., the exclusion from the definition of "sever" of *natural gas returned to a formation* in repressuring, pressure maintenance or other operation for production of oil and the subsequent legislative grant, by Act 493 of 1973, of an exemption to those engaged in such an operation as that being conducted by appellant. If the legislature had not considered the burning of oil to produce steam or other uses of oil in other methods of repressuring or pressure maintenance to constitute a severance, it would have broadened the exclusion from its definition to include such operations.

Our construction of the basic act is fortified by the passage of Act 493 of 1973, which exempted the products used by appellants, and others, in the manner involved here. Here again, we must presume that the General As-

sembly did not intend to purposelessly pass an act, so the act must be taken as indicative of a previous legislative intent that the oil burned by appellant in its recovery processes be subject to the tax. Legislative intent is to be determined by a consideration of all legislation— prior, contemporaneous and subsequent—on the subject. In *LaFargue v. Waggoner*, 189 Ark. 757, 75 S.W. 2d 235, we adopted and applied the principles then aptly stated at 59 C. J. 1042, which include the following:

> The endeavor should be made, by tracing the history of legislation on the subject, to ascertain the uniform and consistent purpose of the legislature, or to discover how the policy of the legislature with reference to the subject matter has been changed or modified from time to time. In other words, in determining the meaning of a particular statute, resort may be had to the established policy of the legislature as disclosed by a general course of legislation. With this purpose in view therefore it is proper to consider, not only acts passed at the same session of the legislature, but also acts passed at prior and subsequent sessions, and even those which have expired or have been repealed.

We are not impressed by appellant's arguments that the requirements of § 84-2105 that the producer collect or withhold from the proceeds of sale of natural resources the tax due by the respective owners of the resources at the time of severance and the requirement by § 84-2107 of reports from those who purchase natural resources from producers are a clear indication that the legislature intended that the tax only apply to sales. The first section simply permits the producer to distribute the tax burden proportionately among owners of the resources sold. The latter one is simply a means of enforcement of the collection of the tax.

If the legislature had meant for the tax to be paid only on the products sold or exchanged or produced for sale or exchange, it could have said so in simple words and minimized the necessity for definition of terms.

The decree is affirmed.

BYRD, J., dissents.