2012 Ark. 443

Thomas W. KIMBRELL, Commissioner of the Arkansas Department of Education, in his official capacity only; The Arkansas Department of Education; and Martha Shoffner, Treasurer of the State of Arkansas, in her official capacity only, Appellants

v.

Bob Allen McCLESKEY, individually and as a Representative of all similarly situated Taxpayers who Pay Ad Valorem School Taxes for the Support of the Fountain Lake School District; The Fountain Lake School District; Rusty Windle, individually and as a Representative of all similarly situated Taxpayers who Pay Ad Valorem School Taxes for the Support of the Eureka Springs School District; and The Eureka Springs School District, Appellees.

No. 11–1289.

Supreme Court of Arkansas.

Nov. 29, 2012.

Dustin McDaniel, Att'y Gen., by: Scott P. Richardson, Ass't Att'y Gen., for appellants.

Hatfield & Sayre, by: Eugene G. Sayre, Little Rock, for appellees.

PAUL E. DANIELSON, Justice.

Appellants Thomas W. Kimbrell, Commissioner of the Arkansas Department of Education, in his official capacity only; the Arkansas Department of Education; and Martha Shoffner, the Treasurer of the State of Arkansas, in her official capacity

only (hereinafter collectively, "ADE"), appeal from the circuit court's judgment enjoining ADE from seeking repayment of any portion of the twenty-five-mill uniform rate of tax (URT) revenues levied and assessed for purposes of school funding from appellees Bob Allen McCleskey, individually and as a representative of all similarly situated taxpayers who pay ad valorem school taxes for the support of the Fountain Lake School District; the Fountain Lake School District; Rusty Windle, individually and as a representative of all similarly situated taxpayers who pay ad valorem school taxes for the support of the Eureka Springs School District; and the Eureka Springs School District (hereinafter collectively, "the School Districts"). In addition, the order enjoined ADE from "levying, assessing, withholding, or setting off [monies belonging to the School Districts for the repayment of any portion of the twenty-five-mill URT revenues required for school funding] from or against any state or federal monies" owed to the districts and incorporated the circuit court's findings of fact and conclusions of law, which were entered that same day. ADE further appeals from the circuit court's order of January 20, 2012, in which the circuit court declined to hold ADE in contempt and clarified its prior judgment, stating that its injunction applied to any amounts that were currently being set off and withheld by ADE and ordering ADE to pay those amounts to the School Districts.

ADE asserts two points on appeal: (1) that the circuit court erred in its finding that ADE was not authorized by the legislature to recoup and redistribute any UTR revenues received from the School Districts that were in excess of the foundation-funding amount; and (2) that the circuit court erred in finding that ADE lacked the authority to withhold monies from the School Districts where they had submitted deficient budgets that erroneously budgeted as ongoing revenue the amounts of URT revenue in excess of the foundation-funding amounts. The School Districts cross-appeal, urging that the circuit court erred in finding that the revenues generated by the URT were state-tax revenues. We affirm on direct appeal and reverse and remand on cross-appeal.

The instant appeal stems from issues involving the current school-funding system and the disbursement of URT revenues to Arkansas's public-school districts. On May 10, 2011, the School Districts filed their complaint for declaratory judgment and injunctive relief, in which they sought a declaration that any attempt by ADE to demand URT revenues in excess of the foundation-funding amount from the School Districts was illegal and unconstitutional. They contended that the twenty-five-mill URT, which is mandated by Ark. Const. amend. 74, is a special, local-ad valorem-school tax, rather than a state tax, in the amount of twenty-five mills that must be levied and collected and may only be used by these school districts for the maintenance and operation of each school district's schools. The School Districts further sought injunctive relief, enjoining ADE from making such demands for these funds or withholding other funds due to ADE's position it was entitled to the excess funds.

ADE moved to dismiss the School Districts' complaint. In its motion, ADE asserted that the School Districts had received more revenue from the twenty-five-mill URT than necessary to fund the foundation-funding amount for the districts due to the strong tax base in those districts. ADE claimed that it was unconstitutional for the State to allow the tax base of the districts to determine the amount of support they would receive, and therefore, ADE was required to take action to cor-

rect the increase in foundation funding that the districts received. For this reason, ADE maintained, its motion to dismiss the School Districts' complaint should be granted.

The School Districts subsequently filed a motion for preliminary injunction, wherein they requested an injunction directing ADE to cease and desist from any attempt to have the School Districts pay to ADE the monies they received in excess of the foundation-funding amount or any attempt to set off amounts otherwise due to the districts. ADE responded to the motion, stating that the School Districts' alleged monetary harm failed to demonstrate irreparable harm and that the School Districts did not demonstrate a likelihood of success on the merits.

In addition, the School Districts filed a response to ADE's motion to dismiss, asserting that "the 'special local ad valorem school taxes' (25 mill URT) levied, generated and collected locally for these two (2) School Districts have nothing to do with the amount of foundation funding, which was set statutorily by the General Assembly for the 2010–2011 school year, save and except that the amount of such foundation funding represents the 'minimum amount' of monies that the state must assure that *all* school districts in the State of Arkansas have available for the maintenance and operation of the respective schools." They denied receiving any overpayment and asserted that the "special local ad valorem school tax" was a local-ad valorem tax and not a state-ad valorem tax, which was constitutionally prohibited.

On September 12, 2011, the circuit court held a hearing on both motions, and on September 20, 2011, the circuit court entered its findings of fact and conclusions of law and its separate order of judgment. In its findings of fact and conclusions of law, the circuit court concluded that the revenues generated from the twenty-five-mill URT were state-tax revenues and not local-tax revenues. In addition, it found that the excess monies were not an overpayment and that there was no legislative authority for ADE to make demands on the School Districts. In its judgment, the circuit court treated the motions as ones for summary judgment and enjoined ADE from undertaking any action against the School Districts seeking repayment of the monies they had received as URT revenues. It further enjoined ADE from withholding or setting off those amounts received in excess of the foundation-funding amount from other monies to which the School Districts were entitled, and it rendered the injunctions in force and effect until the General Assembly passes legislation authorizing ADE to take such measures. Both ADE and the School Districts filed notices of appeal from the circuit court's orders.

On November 8, 2011, the School Districts moved to have the circuit court hold ADE in contempt of court for failing to send to the districts "*all* amounts of state or federal funds that have been 'withheld' or 'setoff'" by ADE. ADE filed a motion for stay of the circuit court's injunctions, and it responded to the contempt motion, asserting that the motion should be dismissed. The circuit court held a hearing on the motion for contempt on January 17, 2012. At the hearing, the circuit court denied ADE's motion for stay and declined to hold ADE in contempt. It then entered its order, in which it clarified its previous judgment, stating that

> by the language of paragraph 8 of the Judgment entered herein on September 20, 2011, that no categorical funding amounts would be withheld by the ADE defendants from these two school districts that should have been paid during the 2010–11 school years.

It further ordered ADE to pay and release to the School Districts the contested amounts by 12:00 p.m., January 20, 2012, unless ADE requested a stay from this court.[1] ADE filed an amended notice of appeal, and on February 6, 2012, the circuit court denied the School Districts' previously made motion for reconsideration of the circuit court's ruling on their motion for contempt. Both parties now appeal.

## I. Direct Appeal

### A. Authority of ADE to Recoup and Redistribute Excess Monies

■ For its first point on appeal, ADE argues that the circuit court erred in its finding that ADE was not authorized by the General Assembly to recoup and distribute to other school districts any UTR revenues from the School Districts that were in excess of the statutory foundation-funding amount. It urges that the URT is a state tax producing state revenue and that it is unconstitutional for the State to provide state revenue to a school district based solely on the properly wealth of the district. Contending that the School Districts are receiving a bonus based solely on the value of the property in their districts when they receive the total amount of revenues, which exceeds the foundation-funding amount, ADE asserts that the bonuses are inequitable and therefore unconstitutional. ADE maintains that the state's education-funding statutes cannot be read to provide excess foundation funding to the School Districts based simply on their favorable local-property-tax collections. It avers that Ark.Code Ann. § 6–20–2306 (Supp.2009) grants ADE the authority to determine that an overpayment has been made and provides it with remedies. In addition, ADE contends that Ark. Code Ann. § 26–80–101 (Supp.2009) further provides that URT revenues collected may be distributed to other school districts and that this language cannot be ignored.

The School Districts respond that the circuit court was correct in its finding that ADE did not have statutory authority to act as it did regarding any monies in excess of the foundation-funding amount. They contend that the mere processing of the funds through the State Treasurer in no way renders the URT funds state taxes and that Ark.Code Ann. § 26–80–101(a), (b), and (c) statutorily direct that *all* URT funds be finally distributed to the school districts from which the funds were derived, not just those funds meeting the foundation-funding amount. The School Districts point to this court's recognition that variances in revenues may exist and may allow some school districts to enhance curricula, facilities, and equipment such that they are superior to what is deemed adequate by the State; therefore, they counter, ADE's assertion that excess funds run counter to this court's directives is without merit.

Here, ADE asserts that it was within its authority to recoup excess funds from the School Districts and to set off such amounts against other funds due to those districts. It is wholly mistaken. In *Lake View School District No. 25 v. Huckabee*, 351 Ark. 31, 91 S.W.3d 472 (2002), this court held that the State has "an absolute duty under our constitution to provide an adequate education to each school child" and declared that the school-funding system then in place was unconstitutional. 351 Ark. at 71, 91 S.W.3d at 495. Of particular concern to this court in *Lake View* were the four following matters:

(1) the Department of Education has not conducted an adequacy study; (2) despite this court's holding in *DuPree v. Alma Sch. Dist. No. 30*, [279 Ark. 340,

---

1. This court granted ADE's motion to stay on February 9, 2012.

651 S.W.2d 90 (1983) ], that equal opportunity is the touchstone for a constitutional system and not merely equalized revenues, the State has only sought to make revenues equal; (3) despite Judge Imber's 1994 order to the same effect, neither the Executive Branch nor the General Assembly have taken action to correct the imbalance in ultimate expenditures; and (4) the State, in the budgeting process, continues to treat education without the priority and the preference that the constitution demands.

*Id.,* 91 S.W.3d at 495. The General Assembly and Executive Branch were vigilant in their efforts to remedy the unconstitutional school-funding system and, five years later, this court held that the system of public-school financing was in constitutional compliance. *See Lake View Sch. Dist. No. 25 v. Huckabee,* 370 Ark. 139, 257 S.W.3d 879 (2007).

Serving as the basis of our school-funding system, article 14, § 3 of the Arkansas Constitution, which incorporates Amendment 74 to the constitution, provides, in pertinent part:

(a) The General Assembly shall provide for the support of common schools by general law. In order to provide quality education, it is the goal of this state to provide a fair system for the distribution of funds. It is recognized that, in providing such a system, some funding variations may be necessary. The primary reason for allowing such variations is to allow school districts, to the extent permissible, to raise additional funds to enhance the educational system within the school district. It is further recognized that funding variations or restrictions thereon may be necessary in order to comply with, or due to, other provisions of this Constitution, the United States Constitution, state or federal laws, or court orders.

(b)(1) There is established a uniform rate of ad valorem property tax of twenty-five (25) mills to be levied on the assessed value of all taxable real, personal, and utility property in the state to be used solely for maintenance and operation of the schools.

|₈(2) Except as provided in this subsection the uniform rate of tax shall not be an additional levy for maintenance and operation of the schools but shall replace a portion of the existing rate of tax levied by each school district available for maintenance and operation of schools in the school district. The rate of tax available for maintenance and operation levied by each school district on the effective date of this amendment shall be reduced to reflect the levy of the uniform rate of tax. If the rate of tax available for maintenance and operation levied by a school district on the effective date of this amendment exceeds the uniform rate of tax, the excess rate of tax shall continue to be levied by the school district until changed as provided in subsection (c)(1). If the rate of tax available for maintenance and operation levied by a school district on the effective date of this amendment is less than the uniform rate of tax, the uniform rate of tax shall nevertheless be levied in the district.

(3) The uniform rate of tax shall be assessed and collected in the same manner as other school property taxes, but the net revenues from the uniform rate of tax shall be remitted to the State Treasurer and distributed by the state to the school districts as provided by law. No portion of the revenues from the uniform rate of tax shall be retained by the state. The revenues so distributed shall be used by the school districts solely for maintenance and operation of schools.

Ark. Const. art. 14, § 3(a), (b)(1)–(3). In *Fort Smith School District v. Beebe,* 2009 Ark. 333, 322 S.W.3d 1, we explained that Amendment 74 established the uniform rate of taxation of twenty-five mills for each school district to be levied on the assessed value of property and to be used solely for the maintenance and operation of the schools; the revenues collected are sent to the State, and the State later distributes the total funds back to the school districts.

■■■ As article 14, § 3 states, after the URT net revenues are remitted to the State Treasurer, they shall be distributed by the State to the school districts *as provided by law. See* Ark. Const. art. 14, § 3(b)(3). This court must then construe both our constitutional provision and the school-funding statutory scheme to determine how URT revenues in excess of the foundation-funding amount may be distributed. On appeal, our task is to read the laws as they are written and interpret them in accordance with established principles of statutory and constitutional construction. *See Hodges v. Huckabee,* 338 Ark. 454, 995 S.W.2d 341 (1999). The fundamental rule is that the words of the constitution or statute should ordinarily be given their obvious and natural meaning. *See id.* We review issues of statutory construction de novo; it is for this court to decide what a statute means. *See id.* We are not bound by the decision of the circuit court; however, in the absence of a showing that the circuit court erred in its interpretation of the law, that interpretation will be accepted as correct on appeal. *See id.*

The structure of the school-funding system as set forth by the General Assembly in Ark.Code Ann. § 6–20–2305 (Supp. 2009), provides that for each school year,

each school district shall receive state foundation funding aid computed as the difference between the foundation funding amount pursuant to subdivision (a)(2) of this section and the sum of ninety-eight percent (98%) of the uniform rate of tax multiplied by the property assessment of the school district plus the miscellaneous funds of the school district.

Ark.Code Ann. § 6–20–2305(a)(1)(A). For the 2010–2011 school year, "the foundation funding amount is equal to six thousand twenty-three dollars ($6,023) multiplied by the school district's average daily membership for the previous school year." Ark. Code Ann. § 6–20–2305(a)(2)(B). This amount represents what the General Assembly has determined to be the amount expended by school districts "for the provision of an adequate education for each student." Ark.Code Ann. § 6–20–2303(6) (Supp.2009) (defining "foundation funding"). Pursuant to section 6–20–2305(a)(1)(A), the State typically makes up the difference between this amount and the revenue generated by the twenty-five-mill URT in any given school district; this difference is known as "foundation funding aid." *See, e.g.,* Ark.Code Ann. § 6–20–2303(21); *Fort Smith Sch. Dist., supra.* We have observed that this very procedure assures that basic per-student foundation funding is being met. *See Lake View,* 370 Ark. 139, 257 S.W.3d 879.

For the School Districts here, however, their URT revenues generated more than the foundation-funding amount, therefore the State was not required to provide any foundation-funding aid to them. It is the URT revenues of the School Districts in excess of $6,023 that are at issue in the instant case. As required by article 14, § 3(b)(3), Ark.Code Ann. § 26–80–101 establishes the procedures to be followed by both the school districts and the State Treasurer for remitting and distributing

URT revenues. Specifically, that section provides, in relevant part:

> (b)(1)(A) The uniform rate of tax shall be assessed and collected in the same manner as other school property taxes, but the net revenues from the uniform rate of tax shall be remitted to the Treasurer of State and distributed by the state to the county treasurer of each county for distribution to the school districts in that county as provided by subsection (c) of this section.

Ark.Code Ann. § 26–80–101(b)(1)(A). While the State Treasurer obtains the funds from the school districts, the statute, in accord with art. 14, § 3, reiterates that the State (or ADE) is not permitted to retain any portion of the revenues but, instead, must distribute them back to the school districts. ADE claims that the statute permits it to redistribute excess monies to other school districts, rather than to the district from which the funds were derived; however, an examination of the statute's plain language reveals the fallacy of ADE's argument. Subsection (b)(1)(B) of the statute quite clearly provides:

> (B) No portion of the revenues from the uniform rate of tax shall be retained by the state but shall be distributed back to the school district from which the revenues were received or to other school districts *pursuant to subsection (c) of this section.*

Ark. Code Ann. § 26–80–101(b)(1)(B) (emphasis added). Accordingly, subsection (c) controls the distribution of the funds and provides that "[f]or each school year, each county treasurer shall remit the net revenues from the uniform rate of tax *to each local school district from which the revenues were derived.*" Ark.Code Ann. § 26–80–101(c) (emphasis added). While subsection (b)(1)(B) may refer to distribution of the funds to other school districts, clearly lacking from subsection (c) is any authority by which such a distribution may be carried out by the county treasurer. Because there is no provision "by law" to actually distribute the funds to another school district than that from which the funds came, ADE's argument that it is permitted to redistribute the funds to other school districts fails.

ADE argues that such an interpretation would violate the constraints of our decisions in the *Lake View* cases, but it is again mistaken. ADE claims that permitting the school districts from which the excess revenues came to retain those revenues would result in wealth-enhanced districts in violation of our *Lake View* decisions. But ADE sorely misconstrues our holdings in the *Lake View* line of cases.

At issue in *Lake View*, 351 Ark. 31, 91 S.W.3d 472, was the fact that the State was neglecting its duty to determine first and foremost what was necessary for an adequate and substantially equal education. The General Assembly's subsequent adoption of the foundation-funding scheme and its determination of the appropriate foundation-funding amount remedied that problem. As our school-funding scheme currently provides, every district is entitled to those monies required for an adequate education, hence the provision of foundation funding. Of notable importance is the fact that those funds not raised by the school districts will be supplemented by the State in the form of foundation-funding aid to ensure an adequate education for each student.

Indeed, allowing the School Districts to retain any URT revenues in excess of the foundation-funding amount will result in some variations, but variations were clearly contemplated and are explicitly permitted under the plain language of art. 14, § 3. Ark. Const. art. 14, § 3(a) ("It is recognized that, in providing such a system, some funding variations may be nec-

essary. The primary reason for allowing such variations is to allow school districts, to the extent permissible, to raise additional funds to enhance the educational system within the school district."). And further, contrary to ADE's claims, this court has made it abundantly clear that it is not concerned solely with whether revenues are doled out equally to the districts:

> It is clear to this court that in *DuPree* [*v. Alma School District Number 30*, 279 Ark. 340, 651 S.W.2d 90 (1983)], we concentrated on expenditures made per pupil and whether that resulted in equal educational opportunity as the touchstone for constitutionality, not on whether the revenues doled out by the State to the school districts were equal.... We agree that the focus for deciding equality must be on the actual expenditures.

*Lake View*, 351 Ark. at 74–75, 91 S.W.3d at 497. We have further recognized that,

> according to its plain language, amendment 74 "allows for variances in school district revenues above the base millage rate of 25 mills, which may lead to enhanced curricula, facilities, and equipment which are superior to what is deemed adequate by the State."

*Fort Smith Sch. Dist.*, 2009 Ark. 333, at 11, 322 S.W.3d at 7 (quoting *Lake View Sch. Dist. No. 25 v. Huckabee*, 358 Ark. 137, 155, 189 S.W.3d 1, 13 (2004)). Most notably, we have stated, "This does not mean that if certain school districts provide *more than* an adequate education, all school districts must provide *more than* an adequate education with identical curricula, facilities, and equipment." *Lake View*, 358 Ark. at 155, 189 S.W.3d at 13.

In addition, ADE's contention that Ark. Code Ann. § 6–20–2306, which permits ADE to adjust for overpayments, sanctions its actions must also fail. That statute provides certain remedies for ADE where an overpayment has been made to a school district under any appropriation authorized by the subchapter. While the term "overpayment" has not been defined by the General Assembly, it is patently clear that the URT revenues in excess of the foundation-funding amount at issue here were not overpayments in the traditional sense of the word. Section 26–80–101 simply provides that the "net revenues from the uniform rate of tax" shall be remitted to the State Treasurer and distributed by the State to the county treasurer of each county for distribution "pursuant to subsection (c)." Ark.Code Ann. § 26–80–101(b)(1)(A). It does not distinguish between revenues meeting the foundation-funding amount and excess revenues; instead, it simply dictates that "the" net URT revenues "shall" be remitted and distributed. In other words, *all* URT revenues shall be remitted and distributed. Because the statutory scheme in no way suggests a distinction between the URT revenues meeting the foundation-funding amount and those in excess thereof, it cannot be said that the excess funds constituted an overpayment, such that ADE could implement the remedies set forth in section 6–20–2306.

Admittedly, the School Districts here have not "voted in" the excess funds at issue;[2] nonetheless, we consider it a distinction without a difference between excess monies earned as a result of properly values in collecting the twenty-five mills and excess monies raised from an additional ad valorem-property tax enacted by a

**2.** Subsection (c)(1) of art. 14, § 3 permits a school district to levy, by a vote of its qualified electors, an annual ad valorem-property tax for the maintenance and operation of the schools and the retirement of indebtedness. Subsection (c)(3) specifically prohibits any tax so levied from being appropriated to any other district than that for which it was levied.

district. This is so because each and every school district in Arkansas has received, or will receive, funds in the amount that the General Assembly has determined appropriate to provide an adequate education, by virtue of their receipt of the foundation-funding amount.[3] And further, the statutory scheme for the disbursement of URT revenues has no provision establishing a procedure by which ADE might redistribute one district's excess funds to another district.

The dissenters' protestations to our decision today are positively confounding and have absolutely no basis in the law. While they so subtly suggest that the majority's decision is in violation of our decisions in *DuPree* and *Lake View*, nothing could be further from the truth. First, the dissenters have a fundamental misunderstanding of both the facts and the holding in *DuPree*. In that case, this court was faced with a school-funding system, which bore "no relationship to the educational needs of the individual districts," but was "determined *primarily* by the tax base of each district." *DuPree*, 279 Ark. at 345, 651 S.W.2d at 93 (emphasis added). It was a funding system based on district wealth, and we held that such a system of funding had "no rational bearing on the educational needs of the districts." *Id.* at 346, 651 S.W.2d at 93.

In complete contrast, the system in place today is based entirely on the need to provide an adequate and substantially equal education to every student—a system that this court, including two of the dissenters, upheld in *Lake View*, 370 Ark. 139, 257 S.W.3d 879. It is no longer reliant on the state treasury's prosperity, nor is it left to the ever-fluctuating wiles of our school districts' wealth. Instead, it is

based on a determination, first and foremost, of what amount is required to provide the students of this state with an adequate and substantially equal education. Utterly absent from the dissenting opinions is any mention of the foundation-funding amount, which serves as the basis of the instant funding system. Because every school district receives this amount per student, each student is guaranteed an adequate education as demanded by our constitution and mandated by our decisions in the *Lake View* cases. Indeed, no one in the instant case alleges any inadequacy or inequality in the education being received by Arkansas students today, but for the dissenters' machinations.

The dissenters further profess that they are adhering to the General Assembly's intent. But again, nothing could be further from the truth. The very plain language of our constitution requires that the URT revenues be distributed "as provided by law." The General Assembly made clear its intent when it included subsection (c) in section 26–80–101(b)(1)(A), a subsection quite conveniently discounted or ignored by the dissenters. This subsection, in no uncertain terms, requires the return of the URT net revenues "to each local school district from which the revenues were derived."

Our General Assembly has painstakingly set forth the law, in accord with this court's decisions, and this majority recognizes that law and interprets it herein. While the dissenters would have us ignore the General Assembly's efforts, we simply will not do so. Should the General Assembly wish to provide a mechanism or procedure by which excess funds may be distributed to other districts, it is certainly

---

**3.** Indeed, ADE conceded this in its response to the School Districts' motion for preliminary injunction, wherein it asserted that receipt of the foundation-funding amount equates to a district's receipt of a "constitutional level of revenue."

within *its* purview to do so—no time machine required.

In sum, pursuant to our constitution, URT revenues must be distributed as provided by law, and the General Assembly has seen fit to authorize and set forth a procedure that, at least currently, requires that those funds be returned to the sole district from which they were derived. Accordingly, we cannot say that the circuit court erred in so finding.

### B. ADE's Authority over Budgets

■ For its second point on appeal, ADE argues that the circuit court erroneously found that it had wrongly withheld funds from the School Districts based on their failure to submit approved budgets. ADE urges that because the School Districts' budgets included as ongoing revenue the projected excess funds from the URT revenues, the budgets were deficient, and it was required to withhold state grants and aids, namely categorical funding, from the School Districts. ADE asserts that the funds were not withheld for repayment of the URT revenues in excess of the foundation-funding amount, but were withheld because the budgets were deficient in planning to expend revenues above and beyond the foundation-funding amount. ADE further claims that sovereign immunity barred the circuit court from ordering it to pay money damages

The School Districts respond that ADE "set off" amounts of categorical funding due to the School Districts merely because ADE subjectively determined that their budgets were deficient, when in reality they were not. They aver that sovereign immunity has no bearing on the issue.

As a part of the Arkansas Educational Financial Accounting and Reporting Act of 2004, Ark.Code Ann. § 6–20–2202(a)(1) (Supp.2009) requires that the board of directors of each school district in the state shall prepare a budget of expenditures and receipts that shall be filed with ADE each year. The budgets are to be reviewed by the auditors of ADE's financial accountability office to determine whether the requirements of state law and the rules of the State Board of Education regarding the use of school funds and expenditure requirements are being met. *See* Ark. Code Ann. § 6–20–2202(c)(1)(A). If the financial records are deficient, then the school district shall be notified and shall have thirty days to respond prior to suspension of grants and aids. *See* Ark.Code Ann. § 6–20–2202(c)(1)(B). If the auditors determine that the financial records of any school district

> are not properly maintained or that the financial affairs of the school district ... are not administered in accordance with state law or state board rules, grants and aids from the state to which the school district ... may be entitled shall be withheld until it is determined that the fiscal records of the school district ... are in order or that the financial affairs are being properly administered as established by statute or by rule promulgated by the state board, provided that the Department of Education has met all deadlines for providing information to school districts, open-enrollment public charter schools, or education service cooperatives.

Ark.Code Ann. § 6–20–2202(d)(2).

In the instant case, ADE considered the School Districts' submitted budgets deficient in that they included within their budgeted revenue the URT revenues in excess of the foundation-funding amount that ADE believed did not belong to the School Districts. As already set forth above, any belief by ADE that those monies were not to be returned solely to the districts from which they were derived was mistaken. Accordingly, the School

Districts' budgets were not deficient in this manner, and any withholding of categorical funds by ADE from the School Districts on this basis was in error.

In its order of January 20, 2012, the circuit court ordered ADE to pay and release to the School Districts the sums of categorical funding that had been withheld or set off by ADE from the School Districts. According to the circuit court's order, ADE had previously given notice that it would be holding those funds in a separate escrow account. The circuit court found that its prior injunction issued September 20, 2011, applied to the categorical funding due the School Districts, and it directed that those monies be paid to the School Districts.

Because ADE wrongly determined that the School Districts' budgets were deficient and therefore wrongfully withheld the categorical funds to which the School Districts were otherwise entitled, the circuit court did not err in directing ADE to release those funds to the School Districts. They were legally entitled to those funds, and ADE wrongfully withheld them. Any argument by ADE that the circuit court assessed money damages against it in contravention of sovereign immunity is untenable.

For all the foregoing reasons, we affirm the circuit court's orders on direct appeal.

## II. Cross–Appeal

■ For their sole point on cross-appeal, the School Districts argue that the circuit court erred in its conclusion that URT revenues are state-tax revenues. They contend that Amendment 47 to the Arkansas Constitution prohibits any ad valorem tax levied upon property by the State and that Amendment 74 lacks any language therein suggesting that the twenty-five-mill URT ad valorem-school-property tax constitutes a state tax. They aver that the twenty-five-mill URT was not levied by Amendment 74, but was simply established by the Amendment, as evidenced by its language of "to be levied." They further assert that, merely because the revenues pass through the State Treasurer, the funds are in no way converted from local to state revenues.[4] ADE counters that the URT was passed and levied by a collective vote of the people, to be remitted to the State Treasurer, and distributed by the State; therefore, it claims, it is a state tax.

■ Amendment 47 quite clearly and succinctly provides that "[n]o ad-valorem tax shall be levied upon property by the State." Ark. Const. amend. 47. An ad valorem is a tax on the value of property. See Weiss v. McFadden, 353 Ark. 868, 120 S.W.3d 545 (2003). Here, art. 14, § 3(b)(1), as amended by Amendment 74, provides, in relevant part, that "[t]here is established a uniform rate of ad valorem property tax of twenty-five (25) mills to be levied on the assessed value of all taxable real, personal, and utility property in the state to be used solely for maintenance and operation of the schools." The URT was deemed not to be an additional levy,

4. In addition, the School Districts ask this court to remedy the language used in City of Fayetteville v. Washington County, 369 Ark. 455, 255 S.W.3d 844 (2007), which they claim suggests the twenty-five-mill URT is a state tax. We disagree that it does. The language is this:

The 25 mills under Amendment 74, as the circuit court correctly emphasized, is a tax adopted by the collective voters of the state, who levied the uniform rate of 25 mills as a matter of constitutional law when they approved Amendment 74.

369 Ark. at 473, 255 S.W.3d at 856–57. This language in no way holds that the URT or school-district taxes are state taxes.

but was to replace a portion of the existing rate of tax *levied by each school district.* *See* Ark. Const. art. 14, § 3(b)(2). Further, the URT is to be assessed and collected in the same manner as other school-property taxes, but the net revenues are to be remitted to the State Treasurer and distributed to the school districts as provided by law. *See* Ark. Const. art. 14, § 3(b)(3). However, no portion of the revenues from the URT shall be retained by the State. *See id.*

In *Barker v. Frank,* 327 Ark. 589, 939 S.W.2d 837 (1997), this court rejected the notion that school-district taxes were county taxes. Instead, this court noted that "under the constitution school taxes and county taxes are treated differently." 327 Ark. at 594, 939 S.W.2d at 839. This court then noted the distinction drawn by the General Assembly in that it had consistently treated school districts, counties, and municipalities as separate taxing units. *See id.* Such a distinction is evidenced by Ark.Code Ann. § 26–80–104 (Repl.2008), wherein the General Assembly has directed that "[t]he school tax shall be collected in the same manner as county taxes are collected, at the same time and by the same person, and shall be paid into the county treasury." Ark.Code Ann. § 26–80–104(b).

Clearly, the URT is not a county tax, but further absent is any suggestion whatsoever that it is a state tax. To the contrary, both the General Assembly and this court seem to have recognized school taxes as a breed of their own that are neither state nor local. As such, the URT is not converted to a state tax solely because the revenues are remitted to the State Treasurer and then back to the school districts. In *Arco Auto Carriers, Inc. v. State,* 232 Ark. 779, 341 S.W.2d 15 (1960), Arco challenged the validity of certain ad valorem taxes on trucks and equipment used to haul for hire into and through the state in interstate commerce. Arco argued, among other things, that Amendment 47 prohibited the levy of an ad-valorem tax by the State; however, this court disagreed that the tax was a violation of Amendment 47:

Here the State has levied no ad valorem tax. An agency of the State has merely ascertained the value of the property. True, under the provisions of Act 168 of 1953 (Ark.Stats. § 84–614) the Commissioner of Revenues collects the tax, but the same act provides that the State Treasurer shall pay the amounts so collected to the County Aid Fund and in turn shall distribute same to the various counties on a proportionate basis as set out therein (Ark.Stats. § 84–615). It can readily be seen that this is a county tax merely administered by a State agency for the purpose of efficiency, and therefore is not in violation of Amendment 47.

232 Ark. at 783, 341 S.W.2d at 18.

Similarly, the instant tax was approved by the voters, is imposed or levied by local school districts, and is assessed and collected by local county treasurers. While the funds are remitted to the State Treasurer for a brief period,[5] they are then redistributed to the county treasurers for distribution to the school districts from which they came.

There simply is no basis on which to find that the URT is a state-ad valorem tax. Instead, it is a one-of-a-kind tax, a school-district tax, approved by the voters of the State of Arkansas, and levied, assessed, and collected by the counties for the sole

5. The parties seem to agree that the funds are in the hands of the State Treasurer for no more than twenty-four hours at most.

use of the school districts. Any conclusion by the circuit court that the URT revenues were state revenues was simply erroneous. We therefore reverse this sole finding by the circuit court and remand on cross-appeal for entry of an order consistent with this opinion.

Affirmed on direct appeal; reversed and remanded on cross-appeal.

HANNAH, C.J., BROWN, J., and Special Justice GEORGE D. ELLIS dissent.

GUNTER, J., not participating.

JIM HANNAH, Chief Justice, dissenting.

I respectfully dissent. The majority recreates an unconstitutional school funding system in interpreting Arkansas Code Annotated section 26–80–101 (Supp.2009) to distribute state funding to school districts based upon their wealth. The amount of state funding a school district receives may not depend upon the wealth of the school district. *See Lake View School Dist. No. 25 v. Huckabee,* 351 Ark. 31, 91 S.W.3d 472 (2002); *DuPree v. Alma School Dist. No. 30,* 279 Ark. 340, 651 S.W.2d 90 (1983).

The General Assembly's school-funding system was approved by this court as constitutional. *See Lake View School Dist. No. 25 v. Huckabee,* 370 Ark. 139, 257 S.W.3d 879 (2007). Pursuant to Arkansas Constitution article 14, section 3, the General Assembly provides "for the support of common schools" through a uniform rate of ad valorem tax of twenty-five mills levied by the various school districts. *See* Ark. Const. art. 14, § 3(a)–(b); Ark.Code Ann. § 26–80–101(a)–(b) (Supp.2009). The State is under an obligation to provide "a fair system for distribution of funds." *See* Ark. Const. art. 14, § 3(a). To that end, "the net revenues from the uniform rate of tax shall be remitted to the Treasurer of the State," *see* Ark.Code Ann. § 26–80–101(b)(1)(A), "to be distributed back to the school district from which the revenues were received or to other school districts." Ark.Code Ann. § 26–80–101(b)(1)(B).

The General Assembly sets a foundation-funding amount that is required to fund a school system that meets the constitutional requirement to provide "a general, suitable, and efficient system of free public schools." Ark. Const. art. 14, § 1. If the foundation-funding amount is $6023 per student and school district uniform rate of tax (UTR) revenues provide only $5000 per student, that school district will receive $1300 per student from the State in additional funding. Conversely, if URT revenues provide a school district $9023 per student, $3000 per student must be distributed back to the school districts where URT revenues do not provide $6023 per student. *See* Ark.Code Ann. § 26–80–101(b)(1)(A), (B).

Under the majority's decision, a school district retains all the URT revenues collected in that district under the twenty-five-mill levy, whether that works out to, for example, school funding of $9000 per student or $900 per student. To the contrary, the URT revenues collected under the twenty-five-mill levy are remitted to the State. The URT revenues and the statutory scheme constitute the fund by which the General Assembly fulfills its constitutional obligation to a fair system of distribution of funds. *See* Ark. Const. art. 14, § 3(a); Ark.Code Ann. § 26–80–101. The General Assembly distributes this fund to provide the required foundation funding per student. Uniform-rate-of-tax revenues in excess of the amount required to provide the required foundation-funding for any given school district are used by the General Assembly to bring school-district funding to the required level in all

districts. The majority decision deprives the General Assembly of a constitutional means of providing the less wealthy school districts with the required foundation funding.

Admittedly, the phrase "from which the revenues were derived" in Arkansas Code Annotated section 26–80–101(c) is less than clear. "This court, however, will not give statutes a literal interpretation if it leads to absurd consequences that are contrary to legislative intent." *McMillan v. Live Nation Entm't, Inc.*, 2012 Ark. 166, at 12; 401 S.W.3d 473, 480. "If the statute is ambiguous, this court looks to the legislative history of the statute and other factors, such as the language used and the subject matter involved." *Id.*, 401 S.W.3d at 480. Clearly, the intent of the General Assembly was to provide a constitutional system of school funding and not to provide a system already declared unconstitutional by this court.

The majority errantly concludes that the retention of excess URT funds is recognized in article 14, section 3(a), where it is acknowledged that variation in funding will exist; but, the majority misreads the constitution. The reason a school district acquires funding per student that varies from the foundation-funding amount is that school districts are permitted to "raise additional funds to enhance the educational system within the school district." *See* Ark. Const. art. 14, § 3(a). In other words, if a school district wishes to enhance its educational system beyond that permitted by the foundation-funding amount, it may raise funds in addition to the foundation funding received from the State. A school district may impose millage in addition to the twenty-five-mill URT and retain the revenues obtained. However, the law is clear that the entire amount of URT revenues produced in any given school district by the twenty-five-mill levy must be remitted to the State for distribution back to the school district from which the revenues were received or to other school districts.

Additionally, under the majority's interpretation of section 26–80–101, the county treasurer remits to the State Treasurer the total URT revenues collected and then receives back precisely the same sum because all funds collected in a given school district must be returned to that same school district. If this were correct, there would be no reason to remit the revenues to the State Treasurer. It would be a vain and useless act. We have stated that "[i]n construing statutes, we will not presume the legislature to have done a vain and useless thing." *Snowden v. JRE Invs., Inc.*, 2010 Ark. 276, at 15, 370 S.W.3d 215, 223 (citing *Phillips Petroleum Co. v. Heath*, 254 Ark. 847, 497 S.W.2d 30 (1973)). To the contrary, "we reconcile provisions to make them consistent, harmonious, and sensible." *Id.*, 370 S.W.3d at 223.

The majority nullifies ten years of difficult and painstaking work diligently undertaken by the General Assembly, the Department of Education, the Attorney General, and the Governor, to provide this state with a constitutional school-funding system. The state's carefully crafted constitutional system of state-funded public education is obliterated by the majority's decision. The twenty-five-mill tax levied pursuant to article 14, section 3 of the Arkansas Constitution for provision of common schools must now remain within each school district from which the tax was derived. The majority leaves us with a public-school-funding system dependent upon the wealth of the district, which this court has declared to be unconstitutional. "If possible, this court will construe a statute so that it is constitutional." *Summerville v. Thrower*, 369 Ark. 231, 236, 253

S.W.3d 415, 418 (2007). The majority can, and should, do so in this case. The majority decision is contrary to law and precedent. Therefore, I dissent.

BROWN, J., and Special Justice GEORGE D. ELLIS join this dissent.

ROBERT L. BROWN, Justice, dissenting.

Today's decision takes us back twenty-nine years to a time when a student's public education was based on the property wealth of that student's school district. Under that system, students in wealthier school districts fared much better with respect to the educational opportunities available to them, because the property wealth of those districts generated more tax revenue for school operations. This court expressly held in a landmark decision in 1983 that a school-funding system based on property wealth was inherently discriminatory and violated the Arkansas Constitution. *DuPree v. Alma Sch. Dist. No. 30,* 279 Ark. 340, 651 S.W.2d 90 (1983). In the later *Lake View* cases, we endorsed and reiterated the *DuPree* position.[1] Those decisions were beacons in this state for the basic precepts of equality.

Now, a majority of this court has eroded this fundamental, constitutional principle premised on economic equality and returned this court to a pre-*DuPree* standard where property wealth can be used by the State of Arkansas to benefit some school districts more than others. I cannot countenance such a sea change in our constitutional law.

Under the majority's decision, the State, by state appropriation, may now allocate URT funds to two school districts in excess of the foundation-funding amounts, which are the state-funding limits established by the General Assembly for all school districts in the state. This overpayment in state funding for these two school districts is based solely on the property wealth of those districts, and the State in the form of the Arkansas Department of Education (ADE), according to the majority, cannot recoup the overpayments. Not only is today's decision out of sync with *DuPree* and the *Lake View* cases, it etches in stone a discriminatory policy based on wealth that is directly at odds with amendment 74, state statutes, and this court's case law. Under the majority's reasoning, if URT funds resulted in education funding that was two or three times that paid to other school districts in the state because of property wealth, that would pass constitutional muster. That, of course, is manifestly wrong.

No matter how much the majority would like to believe it, URT funds that are sent to the State and then reallocated by the State Treasurer back to the school districts do not simply "pass through" the Treasurer's office. Those funds are returned to the school districts under the authority of a specific state appropriation, a fact the majority opinion never acknowledges.[2] Accordingly, this is vastly differ-

1. *Lake View Sch. Dist. No. 25 of Phillips Cnty. v. Huckabee (Lake View IV),* 370 Ark. 139, 257 S.W.3d 879 (2007); *Lake View Sch. Dist. No. 25 of Phillips Cnty. v. Huckabee (Lake View III),* 364 Ark. 398, 220 S.W.3d 645 (2005); *Lake View Sch. Dist. No. 25 of Phillips Cnty. v. Huckabee (Lake View II),* 358 Ark. 137, 189 S.W.3d 1 (2004); *Lake View Sch. Dist. No. 25 of Phillips Cnty. v. Huckabee (Lake View I),* 351 Ark. 31, 91 S.W.3d 472 (2002); *Lake View Sch. Dist. No. 25 of Phillips Cnty. v. Huckabee,* 340 Ark. 481, 10 S.W.3d 892 (2000); *Tucker v. Lake View Sch. Dist. No. 25 of Phillips Cnty.,* 323 Ark. 693, 917 S.W.2d 530 (1996).

2. *See* Act of Feb. 12, 2009, No. 124, 2009 Ark. Acts 489 (appropriation for distribution of Amendment 74 funds for fiscal year 2009–2010).

ent from a situation where school districts levy more taxes for school operations· by local ordinance above and beyond what the URT provides, as referenced in *Lake View II.* Why? Because the State is directly involved in the allocation of funds to the school districts and cannot discriminate against poorer school districts based on property wealth. A school district, on the other hand, has every right to levy a tax for additional revenue to benefit its school. Far from being a distinction without a difference, as the majority puts it, a state appropriation is simply not the same thing as a millage increase levied by a school district.

There is no disagreement on this point by the ADE and the Attorney General. *See* Op. Ark. Att'y Gen. No. 094 (2010). Both agree that the School Districts in the instant case are woefully out of constitutional step in seeking to retain URT revenues that exceed the prescribed foundation-funding amounts. This court's majority, however, has cast that aside and has decided that discriminatory payouts are now the new normal. This, without a doubt, opens a Pandora's box of practices favoring the state's wealthier school districts with excessive and disparate URT payouts.

The other rationales used to justify the majority's decision are based on false reasoning. For example, the majority discounts the plain and simple language in the School District Taxes Code that provides:

> (B) No portion of the revenues from the uniform rate of tax shall be retained by the State but shall be distributed back to the school district from which the revenues were received *or to other school districts* pursuant to subsection (c) of this section.

Ark.Code Ann. § 26–80–101(b)(1)(B) (Supp.2009) (emphasis added). This corre-sponds with amendment 74, which also provides: "The net revenues from the uniform rate of tax shall be remitted to the State Treasurer and *distributed by the state to the school districts as provided by law.*" Ark. Const. art. 14, § 3 (emphasis added). Clearly, this language authorizes the State to distribute URT funds to "school districts" and does not limit distribution of overpayments to the originating school district.

I agree with the majority that the referenced "subsection c" in section 26–80–101(b)(1)(B) does not specifically address what is to be done with excess URT funds, but amendment 74 expressly says that URT funds must be distributed "as provided by law." And the law of Arkansas is clear that educational funding must not be distributed by the State on a discriminatory basis. *See* Ark. Const. art. 14, § 1 & art. 2, §§ 2, 3, 18; *Lake View II,* 358 Ark. at 137, 189 S.W.3d at 1; *Lake View I,* 351 Ark. at 31, 91 S.W.3d at 472; *DuPree,* 279 Ark. at 340, 651 S.W.2d at 90. The majority opinion either overlooks this or discounts the constitutional law on this point throughout the opinion.

Next, the majority misreads amendment 74 and concludes that it authorizes the State to discriminate in URT funding in favor of wealthier school districts. The plain language of this court's opinion in *Lake View II* and in amendment 74, however, make it abundantly clear that school districts may only raise additional funds above the URT *by local ordinance* to enhance their educational systems. Amendment 74 specifically reads, "*In addition to* the uniform rate of tax ... school districts are authorized to levy, by a vote of the qualified electors respectively thereof, an annual ad valorem property tax on the assessed value of taxable real, personal, and utility property for the maintenance and operation of schools." Ark. Const. art.

14, § 3(c)(1) (emphasis added). Hence, any variation for increased school funding above foundation-funding limits must be the result of a local tax levied in addition to the URT funds raised under amendment 74. Amendment 74 manifestly provides school districts with the flexibility to raise more money locally for the maintenance and operation of their schools, but this is done annually in local school elections—not through the URT.

The majority goes on to conclude that URT funds distributed by the State in excess of foundation funding for all other school districts is not an overpayment. Specifically, the opinion reads, "it cannot be said that the excess funds constituted an overpayment." I |₃₀disagree. Excess URT funds over and above what is owed to a school district in foundation funding is most certainly an overpayment. Moreover, there is authority for the ADE to withhold overpayments from subsequent state funding or request a refund from the school district for the overpayment. See Ark.Code Ann. § 6–20–2306 (Supp. 2011). The majority, nevertheless, maintains that section 6–20–2306 refers only to overpayments "under any appropriation authorized by this subchapter," which, it contends, does not embrace URT overpayments. But that too is incorrect. The subchapter involved is the Public School Funding Act of 2003, codified at Ark.Code Ann. §§ 6–20–2301 to –2307, which specifically includes the URT in its formula for setting foundation-funding aid.

With respect to whether the URT is a state tax, the majority writes that the URT is not a state tax or a local tax but "a breed of [its] own" and "one of a kind." This "neither fish nor fowl" description of the URT will be news to both the school districts and the ADE. And the conclusion flies in the face of both amendment 74 and our case law. When it reached its decision that the URT is a state tax, the circuit court relied on *City of Fayetteville v. Washington County*, in which this court said, "The 25 mills under Amendment 74 ... is a tax adopted by the collective voters of the state, who levied the uniform rate of 25 mills as a matter of constitutional law when they approved Amendment 74." 369 Ark. 455, 473, 255 S.W.3d 844, 856–57 (2007). Prior to *City of Fayetteville*, this court noted that the URT was established by, and levied under, amendment 74:

> Adopted by the people of Arkansas at the 1996 general election, Amendment 74 of the Arkansas Constitution established the uniform rate of taxation of twenty-five mills for each school district to be levied on the assessed value of property and to be used solely for the maintenance and operation of the schools.

|₃₁*Beebe v. Fountain Lake Sch. Dist.*, 365 Ark. 536, 545–46, 231 S.W.3d 628, 636 (2006) (relying on Ark. Const. art. 14, § 3(b)(1)).

Not only has this court squarely found that the URT is established and levied under amendment 74 as a uniform tax by the Arkansas people, but the language of amendment 74 supports this court's interpretation:

> (b)(1) There is established *a uniform rate of ad valorem property tax* of twenty-five (25) mills to be levied on the assessed value of all taxable real, personal, and utility property in the state to be used solely for maintenance and operation of the schools.
>
> . . . .
>
> (4) The General Assembly may by law propose an increase or decrease in the uniform rate of tax and submit the question *to the electors of the state* at the next general election.
>
> . . . .
>
> (c)(1) *In addition to the uniform rate of tax provided in subsection (b),* school

862

districts are authorized to levy, by a vote of the qualified electors respectively thereof, an annual ad valorem property tax on the assessed value of taxable real, personal, and utility property for the maintenance and operation of schools and the retirement of indebtedness.

Ark. Const. art. 14, § 3(b)(1), (b)(2), (c)(1) (emphasis added). Added to this is the fact that when URT funds are returned to the school districts by the State Treasurer, this is done by state appropriation, as has already been noted.

As a result, for the General Assembly to propose an increase in the URT, it must be submitted "to the electors of the state," not to a local school district. Were the URT not a state tax, local school districts would have the power to increase the URT for their particular districts above the 25 mills established in amendment 74 as a uniform tax. That would shred any notion of equality and strike at the very heart of uniformity.

The majority makes a passing reference to amendment 47, which forecloses a state ad valorem tax. Although this argument was not specifically addressed by the circuit court in its order, our law has been clear for more than eighty years that a subsequent amendment to the Arkansas Constitution like amendment 74 necessarily amends a previous provision like amendment 47. See Chesshir v. Copeland, 182 Ark. 425, 32 S.W.2d 301 (1930) (holding that where there is an inconsistency between an earlier amendment to the Arkansas Constitution and a later amendment, the last amendment, being the last expression of the sovereign will of the people, will prevail as an implied repeal of the former to the extent they conflict); Lybrand v. Wafford, 174 Ark. 298, 296 S.W. 729 (1927) (noting the well-founded principle that the last amendment to a constitution adopted by the people must control over earlier provisions or amendments to that constitution where there is irreconcilable conflict). In this case, amendment 74 carves out an exception to amendment 47 as "a uniform rate of ad valorem property tax of twenty-five (25) mills to be levied on the assessed value of all taxable real, personal, and utility property in the state." Ark. Const. art. 14, § 3.

By ruling as it has, a majority of this court has reentered a pre-DuPree world where the wealth of a school district determines how well a child will be educated, and the State allocates funding accordingly. Certainly, the Lake View cases dealt with adequacy in education, but Lake View I and II in particular underscored the constitutional mandate that funding be equal, harking back to the fundamental principles set forth in DuPree.

I have no disagreement with the majority's statement that foundation funding sets a benchmark for equality in education. Where the majority runs far afield, however, is in failing to recognize that unlimited URT funding above foundation-funding amounts that is appropriated by the state and based on a school district's property wealth violates the whole notion of equality. Without question, when our constitution requires that URT revenues be distributed "as provided by law," that embraces the state constitution and not merely statutory law.

To regress on the progress Arkansas has made in state education on the twin grounds of equality and adequacy—based on this court's decisions in DuPree and the Lake View cases—is disturbing and a sad commentary. A signal has now been sent that the constitutional principles fixed in those cases are not inviolate and, indeed, can be watered down and marginalized.

For all of these reasons, I respectfully dissent.

HANNAH, C.J., and Special Justice GEORGE D. ELLIS join this dissent.

# 863

GEORGE D. ELLIS, Special Justice, dissenting.

I join the dissent of the Chief Justice and Justice Brown. The majority opinion takes us back to the days before the *Du-Pree* and *Lake View* decisions. It is as if the majority has entered a time machine. Under the majority opinion, we will again have a wealth-driven system of public education which was *precisely* the problem with our system in the first place.

The majority ignores the obvious. The Chief Justice quite accurately cites *Snowden v. JRE Invs., Inc.*, 2010 Ark. 276, at 15, 370 S.W.3d 215, 223 (citing *Phillips Petroleum Co. v.* ₈₄*Heath*, 254 Ark. 847, 497 S.W.2d 30 (1973)): "[i]n construing statutes, we will not presume the legislature to have done a vain and useless thing." But that is what the majority has done in its interpretation of Ark.Code Ann. § 26–8–101(b)(1)(B) (Supp.2009), which provides that net URT revenues shall be remitted to the treasurer "to be distributed back to the school district from which the revenues were received *or to other school districts.*" The last phrase of the statute is simply ignored by the majority. The legislature did not do "a vain and useless thing." The legislature meant what it said by including the language "*or to other school districts*" in the statute.

With the majority opinion we again have a closed-loop system of wealth-driven education in this state which is *precisely* what this Court outlawed.

I respectfully dissent.

HANNAH, C.J., and BROWN, J., join this dissent.